**SLIP OP. 00-126**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| MANNESMANNROHREN-WERKE AG AND MANNESMANN PIPE & STEEL CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **BEFORE: Wallach, Judge** |
| v. | : | **Court No.: 98-04-00886** |
| | : | |
| THE UNITED STATES, | : | **PUBLIC VERSION** |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| GULF STATE TUBE DIVISION OF | : | |
| VISION METALS, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

Decided: October 5, 2000

Sutherland Asbill & Brennan LLP (Mark D. Herlach, Mary Patricia Michel and Christer L. Mossberg), Washington, DC, for Plaintiffs.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch (William L. Olsen); Brian Peck, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Schagrin Associates (Roger B. Schagrin), Washington, DC, for Defendant-Intervenor.

**OPINION**

# I

## INTRODUCTION

This case comes before the court following a remand to the United States Department of Commerce, International Trade Administration ("the Department" or "Commerce"). Mannesmannrohren-Werke AG v. United States, 77 F.Supp.2d 1302 (CIT 1999) ("Mannesmann I"). Familiarity with the court's earlier opinion is presumed.

The court finds that Commerce has remedied the defects in its earlier decision by identifying substantial record evidence in support of its use of adverse facts available in valuing Mannesmann's billet purchases, and by applying non-adverse facts available in determining the U.S. duties paid, and affirms the Department's Remand Determination: Mannesmannrohren-Werke AG and Mannesmann Pipe & Steel Corp. v. United States and Gulf States Tube Division of Vision Metals (Dep't Commerce) (Jan. 27, 2000) ("Remand Determination").

# II

## STANDARD OF REVIEW

The court will uphold Commerce's determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

"Substantial evidence is something more than a 'mere scintilla,' and must be enough evidence to reasonably support a conclusion." Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993) (citations omitted); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

### III

### BACKGROUND

On March 18, 1998, Commerce issued Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Germany: Final Results of Antidumping Duty Administrative Review ("Final Results"), 63 Fed. Reg. 13,217 (1998). Mannesmann sought review in this court.

On October 29, 1999, this court remanded the Final Results to Commerce on two issues. See Mannesmann I. First, the court upheld Commerce's interpretation of the statutory framework for valuing Mannesmann's billet costs, but found that Commerce's use of adverse facts available in valuing the billets was unsupported by substantial record evidence because Commerce had not "adequately identified how Mannesmann had 'failed to cooperate by not acting to the best of its ability.'" Id. at 1314. Commerce identified two questions to which Mannesmann had not fully responded, and briefly stated how the responses were inadequate. The court instructed Commerce to reevaluate its use of adverse facts available, and to either identify substantial evidence in support of such use, or apply non-adverse facts available. Mannesmann I at 1317 ("as it now stands, the evidence cited by Commerce in

3

the Final Results, and the explanations it provides in relation to this evidence . . . do not meet the substantial evidence requirement.").

The court also remanded for further consideration Commerce's use of adverse facts available in determining the U.S. duty amounts paid by Mannesmann. The court instructed Commerce to "identify other record evidence to support its use of 'adverse' facts available," or to apply only "reasonable, non-adverse facts available." Id. at 1324.

On January 27, 2000, Commerce issued its Remand Determination. On the first issue, Commerce identified further evidence in support of using adverse facts available for valuing the billets and provided extensive analysis of that evidence in support of its conclusion. On the second issue, Commerce withdrew its use of the adverse inference and applied only facts available.

Mannesmann contests the Remand Determination on both issues. First, it argues that Commerce has not "produce[d] any additional credible evidence to support its use of adverse facts to value Mannesmann's steel billets." Comments of Mannesmannröhren-Werke AG and Mannesmann Pipe & Steel Corporation on the Department's Remand Determination ("Mannesmann's Comments") at 2-3. Second, it argues that Commerce "facially appears to have retreated from its decision to use adverse facts available to calculate Mannesmann's U.S. duty," but that "its Remand Determination remains adverse because the agency has not weight-averaged the deviations found at verification in reported U.S. duty." Id. at 18.

4

**A**

**In the Remand Determination
Commerce Identified Further Evidence in Support of Using Adverse
Facts Available in Regard to Mannesmann's
Affiliated Party Input Adjustment**

In the original Final Results, Commerce identified two questionnaire responses as evidence of

Mannesmann's failure to respond to the best of its ability regarding the valuation of affiliated party

inputs, but only briefly explained its rationale. In the Remand Determination Commerce identified two

additional questionnaire responses and fully explained why each piece of evidence showed

Mannesmann's noncooperation.[1]

The first questionnaire response identified in the Remand Determination was the original Section

D Questionnaire, Question II.A.6. The question reads:

> List the major inputs received from affiliated parties and used to produce the merchandise
> under review during the cost calculation period. A major input is an essential component of the
> finished merchandise which accounts for a significant percentage of the total cost of materials,
> the total labor costs, or the overhead costs incurred to produce one unit of the merchandise
> under review. For each major input identified, provide the following information:
>
> > a. the total volume and value of the input purchased from all sources by your company
> > during the cost calculation period, and the total volume and value purchased from each
> > affiliated party during the same period;

---

[1]The four questionnaire responses identified were Section D Questionnaire, Question II.A.6;
Supplemental Section D Questionnaire, Question 11; Supplemental Section D Questionnaire, Question
12; and Second Supplemental Section D Questionnaire, Question 4. Only the Section D
Questionnaire, Question II.A.6 and the Second Supplemental Section D Questionnaire, Question 4
were identified in the Final Results.

b.  the per-unit transfer price charged for the input by the affiliated party (if the affiliated party sells the identical input to other, unaffiliated purchasers, provide documentation showing the price paid for the input by the unaffiliated purchaser; if your company purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input).

Antidumping Duty Questionnaire, Section D ("Section D Questionnaire") (September 18, 1996), at D-3 (emphasis added).

Commerce stated that the answers to this section of questions were "necessary for a determination of whether Mannesmann's transfer prices reflected normal market value in the Department's COP [cost of production] investigation of sales in its home market and is key information to determine whether Mannesmann's sales in its home market were below cost." Remand Determination at 12-13. Subpart (b) specifically "is designed to provide Commerce with the necessary data to compare transfer price, market price and cost of the major input under sections 773(f)(2) and (3) of the Act." Id. at 13-14.

The question requested information in regard to "merchandise under review." Mannesmann's responses to both subsections a. and b. of this question were in terms of "subject merchandise." Response of Mannesmannröhren-Werke AG (MRW) and Mannesmann Pipe & Steel Corporation (MPS) to Section D of the Department's Request for Information ("Section D Response") (March 14, 1997), at 8-13. For purposes of the antidumping questionnaire, Commerce defined "products under review" or "merchandise under investigation," herein referred to as "merchandise under review," as "all products within the scope of the [antidumping] order that your company sold during the period of

6

review in any market," and "subject merchandise" as "products sold to the United States." Antidumping Duty Questionnaire, Section A (Sept. 18, 1996), at 15, n. 6; Remand Determination at 8. The former being much broader than the latter, Commerce found that Mannesmann had not provided the information requested. Remand Determination at 9.

Mannesmann's argument in the earlier proceedings before this court was that they read the question to mean "subject merchandise." Id. at 13 (citing Memorandum in Support of the Motion of Plaintiff (Mannesmann) for Judgment on the Agency Record at 15 and Fn. 6). However, Commerce did not accept this argument on remand. Id. In the Remand Determination, Commerce stated that "Mannesmann should have understood what Commerce meant by the term 'merchandise under review,' because this term was explained in the same definition section that Mannesmann referred to in its claim of understanding the question within the context of 'subject merchandise.' Further, if Mannesmann had any questions about Commerce's questionnaire, including the definition of any term or the coverage of question [II.A.6], it was instructed to contact Commerce for clarification." Id.

After receiving Mannesmann's response to the Section D Questionnaire, Commerce attempted to "remedy the deficiencies" in the response by sending two supplemental questionnaires to Mannesmann. Id. at 14.

The first was the Supplemental Section D Questionnaire. Question 11 of that questionnaire reads:

7

As requested in the original Section D questionnaire, please provide a complete, translated listing of **all inputs** used to produce the merchandise under review. For each input received from an affiliated party, provide the name of the affiliated party and state the nature of the affiliation. Also, report the total volume and value of the purchases and the percentage of the COM [cost of materials] of the subject merchandise represented by the value of the purchases.

Mannesmann Supplemental Section D Questionnaire ("Supplemental Section D Questionnaire") (April 18, 1997), at 23 (emphasis in original). This question was intended to "remedy the deficiencies in the original" questionnaire. Remand Determination at 14.

Mannesmann's response stated, in its entirety, "Steel billets are the only input from affiliated suppliers for the subject merchandise. All of the steel billets for producing the subject merchandise were produced at HKM." Response of Mannesmannröhren-Werke AG (MRW) and Mannesmann Pipe & Steel Corporation (MPS) to the Department's Supplemental Section D Antidumping Questionnaire ("Supplemental Section D Response") (May 16, 1997), at 7.

Question 12 reads:

Use the following headings to provide a chart which reports purchases of billets from *unrelated* suppliers, regardless of whether or not they are used in subject merchandise. (Unrelated supplier, month during POR [period of review], billet grade, volume purchased, value of purchases [sic])

Supplemental Section D Questionnaire at 23 (emphasis in original).

The chart created by Mannesmann was attached as Exhibit D-4. Supplemental Section D Response at Ex. D-4. Contrary to Commerce's request, it provided no billet grade information. Commerce said the information "might have permitted Commerce to discover that the purchases from

8

unaffiliated parties were of the same grade as those produced by Mannesmann's affiliated party

[HKM]." Remand Determination at 14.

The Second Supplemental Section D Questionnaire was sent to Mannesmann after Commerce

received its response to the Supplemental Section D Questionnaire. In the Remand Determination

Commerce specifically pointed to Question 4, which reads:

> In Exhibit D-4 of the Supplemental D questionnaire response, you provided a breakdown of billet purchases from unaffiliated parties. When compared to the billet prices provided in Exhibit E of the Section D response, it appears that the average POR cost of billets purchased from unaffiliated parties significantly exceeds the cost of billets purchased from HKM. Explain the reason for such difference.

Mannesmann Second Supplemental Section D Questionnaire ("Second Supplemental Section D

Questionnaire") (June 13, 1997), at 87.

Mannesmann's response reads, in relevant part, "MWR and MWS only purchase from other

suppliers billets that HKM does not produce, such as billets comprised of special alloy grades or

purities." That statement was materially false. At verification Commerce "[s]ampl[ed] Mannesmann's

purchases for one month [and] discovered purchases by Mannesmann of the same grade of billets from

both HKM [its affiliated supplier] and an unaffiliated supplier." Mannesmann I at 1308; see

Department of Commerce Final Results Analysis Memorandum of 03/09/08 at 14.

Once it found Mannesmann's statement was untrue, Commerce questioned a company official

who "informed the verifiers that there were in fact certain circumstances under which Mannesmann

9

purchased billets from unaffiliated suppliers notwithstanding their availability from HKM." Remand Determination at 14-15. Commerce continues, "Hence, Mannesmann was aware of such purchases and had ample opportunity to provide the requested information." Id. at 15. This official who said at verification that indeed there were such sales, also admitted that he was involved in the preparation of the questionnaire responses. Case Brief of Mannesmannröhren-Werke AG and Mannesmann Pipe & Steel Corporation, Ex. 2, [Dr. Franz L.] Klapp Decl.; Defendant's Rebuttal Comments to Plaintiff's Comments Opposing Remand Determination at 3-4.

Commerce found that this series of four questionnaire responses demonstrated "a pattern of behavior . . . from which Commerce [could] reasonably draw inferences to determine that Mannesmann failed to cooperate to the best of its ability." Remand Determination at 12. In the first instance, Commerce found it "difficult to understand how Mannesmann could have read [Question II.A.6] within the context of *subject merchandise* as it claims," when the term did not appear in the question, but "merchandise under review" did. Id. at 13 (emphasis added). Mannesmann had clearly read the section defining both terms, and cited to it for its own purposes. Id.

Commerce attempted to "remedy the deficiencies" in Mannesmann's response by sending supplemental questionnaires, but "Mannesmann failed to provide complete information." Id. at 14; see Supplemental Section D Response at Ex. D-4.

10

Based upon this evidence Commerce made the following finding:

> Therefore, Commerce believes it is reasonable to determine that Mannesmann failed to cooperate by not acting to the best of its ability to comply with several requests for information regarding any purchases of identical inputs from unaffiliated suppliers, because it was not forthcoming and provided both incomplete and inconsistent responses and explanations.

Remand Determination at 15.

This analysis differs from the Final Results. In the Final Results, Commerce identified only Question II.A.6.b. of the Section D Questionnaire and Question 4 of the Second Supplemental Section D Questionnaire as evidence of Mannesmann's failure to respond to the best of its ability. Mannesmann I at 1315. The extent of Commerce's analysis on the first question was detailed in this court's earlier opinion:

> In discussing the first of these errors [Question II.A.6.b.] in the Final Results, Commerce stated simply that "[m]arket price information was requested in the Section D questionnaire for any purchases of the identical input from unaffiliated suppliers, but Mannesmann did not respond to this portion of the questionnaire." Final Results, 63 Fed. Reg. at 13,220. In its Final Results Memorandum, Commerce remarked on the significance of this omission, stating that Mannesmann "failed to respond to the Department's request to an issue that has great importance and relevance to the verification." Final Results Memo. at 14.

Id.

As to Question 4, Commerce simply stated:

> At verification the Department attempted to verify this claim by examining Mannesmann's purchases of billets in one sample month. We discovered one such purchase in this month, and utilized this purchase price as market value.

11

Final Results, 63 Fed. Reg. at 13,220. The extent of Commerce's explanation for its conclusion was "[i]t is reasonable to assume that because Mannesmann's assertion was found to be untrue in one sample month, that there may have been other instances in which Mannesmann's claim proved untrue and the same grade of billets was purchased from both HKM and an unaffiliated party." Final Results Memo. at 14-15. That explanation has now been comprehensively expanded.

**B**

**Commerce Applied Only Non-adverse Facts Available in**
**Valuing Mannesmann's Reported U.S. Duties**

In addition to its expanded explanation of its use of adverse facts available in valuing Mannesmann's affiliated party inputs, in the Remand Determination, Commerce chose not to apply adverse facts available in valuing Mannesmann's U.S. duties paid, and instead applied only non-adverse facts available. Remand Determination at 17.

In responding to Section C of Commerce's Antidumping Questionnaire, Mannesmann underreported the duties it had paid on its United States imports. Mannesmann I at 1308. In the Final Results, Commerce used adverse facts available to adjust Mannesmann's reported U.S. duties paid. This court's prior opinion found Commerce's use of facts available was warranted, but that Commerce's adverse inference was not supported by substantial evidence, reasoning that the discrepancies in duties reported were de minimis in light of the purpose behind Commerce's power to apply adverse facts available. Id. at 1322-23. The average discrepancy was so small that the court did "not find substantial evidence to support Commerce's . . . decision to use adverse facts available."

12

Id. at 1324. Commerce was instructed to either identify further evidence in the record to meet the substantial evidence standard, or use only "reasonable, non-adverse facts available to value the U.S. duties paid by Mannesmann." Id. at 1324-25.

In its Remand Determination, Commerce applied only non-adverse facts available, and did not attempt to identify record evidence which would support the use of adverse facts. Remand Determination at 17. Commerce was able to verify as correct the figures provided by Mannesmann on three of the subject shipments, and used those figures in its analysis. Id. at 17; Mannesmann I at 1308. For the shipments which were observed at verification and the duties reported found to be incorrect, Commerce calculated the correct amounts and applied them. Remand Determination at 17. "As facts available for all sales not examined at verification, [Commerce added] an average discrepancy amount, by observation (of all observations examined at verification) . . . to the reported duty amount. . . ." Id. at 17-18.

## IV
## ANALYSIS

### A

**Commerce's Use of Adverse Facts Available in Valuing Mannesmann's Billets Is Supported by Substantial Evidence on the Record.**

As discussed at length in the court's earlier opinion, Commerce is required to use facts otherwise available in certain circumstances. This court upheld Commerce's use of such facts in valuing

13

Mannesmann's steel billet purchases. Mannesmann I at 1312. However, before Commerce can apply an adverse inference to facts available it must find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b) (1994). See Mannesmann I at 1312-13; Ferro Union, Inc. v. United States, 44 F.Supp.2d 1310, 1330 (CIT 1999) (Before applying an adverse inference, Commerce must find "that a respondent could have complied, and failed to do so."). That finding must be supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).

In Mannesmann I, this court held that "to be supported by substantial evidence, Commerce needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation." Mannesmann I at 1313-14 (citing Ferro Union, 44 F.Supp.2d at 1332). Commerce did not do so in the Final Results. Id. at 1314.

The remand ordered "[i]f Commerce cannot identify substantial record evidence in support of such a conclusion, it may not continue to use adverse facts available in valuing Mannesmann's billet purchases from HKM." Id. at 1317. The court instructed Commerce that it could use the information cited in the Final Results and any other evidence in the record to support its use of adverse facts available. Id.

**1**

**Commerce Has Remedied the Defects this Court Found in the <u>Final Results</u>**

In the <u>Remand Determination</u>, Commerce specifically found that Mannesmann had not acted to the best of its ability in responding to the antidumping questionnaires. As instances in which Mannesmann did not act to the best of its ability in responding to relevant questions Commerce pointed to Mannesmann's Section D Questionnaire Response, Question II.A.6; Supplemental Section D Questionnaire Response, Questions 11 and 12; and Second Supplemental Section D Questionnaire Response, Question 4. <u>Remand Determination</u> at 12-14, 25.

For each item of evidence Commerce specified why Mannesmann's lack of full response was significant. In regard to the Section D Questionnaire Response, Question II.A.6, Commerce stated that "This section is necessary for a determination of whether Mannesmann's transfer prices reflected normal market value in the Department's COP investigation of sales in its home market and is key information to determine whether Mannesmann's sales in its home market were below cost." <u>Id</u>. at 12. In regard to subpart b. specifically, Commerce additionally stated that it was "designed to provide Commerce with the necessary data to compare transfer price, market price and cost of the major input under sections 773(f)(2) and (3) of the Act." <u>Id</u>. at 13-14.

Commerce found Mannesmann's response incomplete because the question asked for information on "merchandise under review," and Mannesmann's response was framed only in terms of

15

"subject merchandise," which is narrower than "merchandise under review." Id. at 8. By so limiting its response, Mannesmann did not provide the information requested.

The Supplemental Section D Questionnaire was sent to Mannesmann "in an effort to remedy the deficiencies in the original questionnaire." Id. at 14. Question 11 requested information on inputs used to produce the merchandise under review. Supplemental Section D Questionnaire at 23. Commerce again found Mannesmann's response lacking because it again limited its response to "subject merchandise." Remand Determination at 9.

Question 12 requested a chart reporting purchases of billets from unrelated suppliers, and provided a list of headings required in the chart. That list included billet grade. Supplemental Section D Questionnaire at 23. Mannesmann's response to Question 12 omitted the requested billet grade information. Commerce stated that had the missing information been provided, Commerce might have uncovered the affiliated party purchases that were identical to the unaffiliated party purchases much earlier than it actually did. Remand Determination at 14.

The Department identified Question 4 of the Second Supplemental Section D Questionnaire as containing an untrue statement in regard to the information missing from Question 12, above. Id. Mannesmann claimed to have not purchased identical steel billets from HKM and unaffiliated suppliers, but Commerce's attempt to verify that information uncovered such purchases. Mannesmann I at 1308.

16

Commerce specifically found that Mannesmann had not acted to the best of its ability in responding to this series of questionnaires. It found that the incomplete response to the first questionnaire, Question II.A.6 was evidence Mannesmann was not acting to the best of its ability because "Mannesmann . . . withheld information requested by Commerce and . . . failed to provide such information by the deadline in the form and manner requested." Remand Determination at 11. As to the other three questionnaires cited, Commerce found that they "were only met with a repetition of the deficient information." Id.

Mannesmann argues that Commerce has not met the substantial evidence standard and that Commerce's use of adverse facts available remains unwarranted. It says that "the Department has been unable to produce any additional credible evidence to support its use of adverse facts to value Mannesmann's steel billets." Mannesmann's Comments at 2.

The evidence identified in the Remand Determination and the analysis given by Commerce are far more complete than that provided in the Final Results. Commerce used the two previously identified pieces of evidence, but provided much more analysis and detailed explanation of why the responses were deficient and why the absence of the information requested was of significance to the investigation. See Mannesmann I at 1314. It also identified two additional pieces of evidence and extensively analyzed them as to their import and the significance of their absence.

17

The evidence identified by Commerce in the Remand Determination and detailed above, and Commerce's analysis of that evidence, rise to the level of substantial record evidence. It demonstrates a pattern of unresponsiveness and evasiveness that hindered Commerce's efforts to uncover the truth. When Commerce did not receive satisfactory responses, it asked twice for more information to remedy the deficiencies. Mannesmann chose not to fully respond to the subsequent requests. Commerce has remedied the deficiencies in the Final Results, and therefore the court affirms Commerce's valuation of the steel billet purchases.

**2**

**Mannesmann's "Good Faith" Argument Fails Because it Is Reasonable For
Commerce to Assume That Mannesmann Had
Knowledge of Its Business Operations**

Mannesmann argues that it "did not believe that it made purchases from unaffiliated suppliers that were responsive to" Question II.A.6.b. of the original Section D questionnaire, and that "even if the Department did not obtain the information that it now claims it was seeking in response to its initial questionnaire, the question was answered to the best of Mannesmann's ability, and Mannesmann provided the Department with additional responsive information in follow-up questionnaire responses submitted prior to verification." Mannesmann's Comments at 3-4 (emphasis in original).

The applicable standard of review is whether Commerce's conclusion that Mannesmann did not act to the best of its ability is supported by substantial record evidence. See Mannesmann I at 1312-13. Any ignorance of its own business operations is no excuse for Mannesmann's failure to

18

respond to Commerce's questionnaires, or for false statements.  It was reasonable for Commerce to charge Mannesmann with knowledge of its own operations,[2] and to interpret Mannesmann's failure to provide information in the initial Section D questionnaire as evidence supporting its conclusion that Mannesmann did not respond to the best of its ability.  Since Mannesmann provided no further information to remedy this defect in the supplemental questionnaires, its later responses do nothing to mitigate its original deficient response.

Mannesmann's alleged good faith does not relieve its burden to respond to the best of its ability, and its "ability" includes possessing knowledge of its business operations.  Therefore, Mannesmann's argument that it did not believe it had information responsive to Question II.A.6.b. fails to defeat Commerce's finding that it did not respond to the best of its ability.

---

[2]See United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 43 n. 5 (1st. Cir. 1991) (issuing jury instruction in criminal action reading "a corporation is chargeable with knowledge of any facts known to its officers, employees and agents and it's responsible for the action or inaction of those officers, employees and agents at least to the extent that such knowledge, actions or inactions relate to the conduct of corporation's business."); see also City of Philadelphia v. Westinghouse Electric Corporation, 205 F. Supp 830, 831 (E.D. Penn. 1962) ("A corporation acquires knowledge through its officers and agents and is charged with knowledge of all material facts of which they acquire knowledge while acting within . . . the scope of their authority."  (quotations omitted)).

**Mannesmann's Argument That it Used the Term "Subject Merchandise"
Intentionally Does Not Address Commerce's Concern**

Mannesmann responds to Commerce's statement that Mannesmann used the term "subject merchandise" in its response to Question II.A.6.a. of the first Section D Questionnaire when the question asked about "merchandise under review" by pointing to the last sentence of the response. Mannesmann says, "The context of that response establishes that Mannesmann was, in fact, referring to subject merchandise in the last sentence." Mannesmann's Comments at 6. Mannesmann claims that this sentence was intended to bring Commerce's attention to the point that the inputs were not used in the subject merchandise. Id.

Question II.A.6. reads:

List the major inputs received from affiliated parties and used to produce the merchandise under review during the cost calculation period. A major input is an essential component of the finished merchandise which accounts for a significant percentage of the total cost of materials, the total labor costs, or the overhead costs incurred to produce one unit of the merchandise under review. For each major input identified, provide the following information:

a. the total volume and value of the input purchased from all sources by your company during the cost calculation period, and the total volume and value purchased from each affiliated party during the same period;

b. the per-unit transfer price charged for the input by the affiliated party (if the affiliated party sells the identical input to other, unaffiliated purchasers, provide documentation showing the price paid for the input by the unaffiliated purchaser; if your company purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input).

Antidumping Duty Questionnaire, Section D ("Section D Questionnaire") (September 18, 1996), at D-3 (emphasis added).

The response reads:

> Exhibit E reports the total volume and value of billets received by Mulheim and Zeithain from HKM during the period of review. These figures necessarily include billets that were used to produce both <u>subject and non-subject merchandise</u>. . . . Mannesmann's system does not separately track the volume and value of the billets by application because, in many cases, the long billets from HKM are cut into smaller pieces for rolling and can be used for several orders.
>       Neither Mulheim not Zeithain sourced billets used in producing <u>subject merchandise</u> from unrelated parties.

Section D Response at 8 (emphasis added).

Mannesmann simply did not provide the information requested regarding "merchandise under review." It used "subject merchandise" throughout the response, not just in the last sentence. The question only asked about merchandise under review, and while the last sentence may indeed have highlighted Mannesmann's intent, <u>nothing</u> in the response answered the question. <u>Id</u>. at 9-13. Mannesmann's argument simply does not address the issue.

21

**That the Issues to Which Commerce Points Are Relatively Minor in Comparison to the Overall Volume of Submissions Is Irrelevant to Whether Mannesmann Responded to the Best of its Ability**

Mannesmann argues that Commerce has wrongly focused on its misuse of the term "subject merchandise," since the term was misused in only a small portion of the voluminous submissions. Mannesmann's Comments at 7. It claims that the volume of responses is "powerful circumstantial evidence of cooperation," and that circumstantial evidence is always relevant to the analysis of whether a party has responded to Commerce to the best of its ability. Response of Mannesmannröhren-Werke AG and Mannesmann Pipe & Steel Corporation to the Court's Order Requesting Additional Legal Support. Mannesmann does acknowledge, however, that it found no prior decisions of any court specifying volume of submissions as demonstrating cooperation. Id.

The court finds the overall volume of Mannesmann's submissions on all issues irrelevant to whether it cooperated with Commerce on the specific issues at hand. Commerce found that Mannesmann did not respond fully and honestly to its questionnaires regarding affiliated party billet purchases. Remand Determination at 11. Mannesmann has the burden of creating an adequate record. Ta Chen Stainless Steel Pipe Ltd. v. United States, No. 97-08-01344, 1999 WL 1001194, *13 (CIT Oct. 28, 1999) ("Commerce grounds its argument on the truism that the respondent has the burden of creating an accurate record."); see Chinsung Indus. Co., Ltd. v. United States, 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989) ("[I]f plaintiffs' argument were to prevail the result would be to . . . shift the burden of creating an adequate record from respondents to Commerce."). Its inadequate responses to

the questionnaires specified by Commerce are substantial record evidence in support of Commerce's conclusion that it did not respond to the best of its ability. That Mannesmann submitted a large overall volume of material does not change the support for this conclusion.

## 5

## Mannesmann's Response to Question 11 Is Evidence of its Failure to Respond to the Best of its Ability

Question 11 of the Supplemental Section D Questionnaire requested information for inputs "used to produce the merchandise under review." Mannesmann answered in terms of "subject merchandise." Remand Determination at 9.

## a

## Commerce Has Not Distorted the Character of Question 11

Mannesmann argues that Commerce has "distort[ed] the character of Question 11" in the Remand Determination. Mannesmann's Comments at 8. In support of this allegation, Mannesmann argues that "the Department implies in the . . . Remand Determination that Question 11 relates to 'purchases of inputs from affiliated and unaffiliated suppliers.' That statement is simply incorrect. Question 11 not only appears under the heading 'Affiliated Party Purchases' in the questionnaire, but it also asks only about purchases from *affiliated* suppliers." Id. (emphasis in original).

The court finds upon reading the question itself, however, that it does indeed request information about purchases from both affiliated and unaffiliated suppliers. Mannesmann is correct that Question 11 is under the heading "Affiliated Party Purchases." However, the full text of the question is as follows:

> As requested in the original Section D questionnaire, please provide a complete, translated listing of **all inputs** used to produce the merchandise under review. For each input received from an affiliated party, provide the name of the affiliated party and state the nature of the affiliation. Also, report the total volume and value of the purchases and the percentage of the COM of the subject merchandise represented by the value of the purchases.

Supplemental Section D Questionnaire at 23 (emphasis in original).

The question as written asks for "a complete, translated listing of **all inputs** used to produce the merchandise under review," and then asks for other, more specific information "[f]or each input received from an affiliated party." Id. (emphasis in original). The text makes it clear that information for all inputs, whether from affiliated or unaffiliated parties, was requested, with more specific information requested for affiliated party purchases.

If the question meant what Mannesmann argues it did, then the more specific request regarding those purchases from affiliated parties would apply to the entire response, and the structure of the question would be incoherent. The question clearly goes from the general to the specific; any misunderstanding by Mannesmann of that structure is unreasonable, at best.

24

**b**

**Mannesmann Did Not Answer the Question Asked**

Mannesmann also argues that Commerce's statement that Mannesmann answered Question 11 in terms of "subject merchandise" instead of "merchandise under review" is misleading because the question has three parts: the first asks only about merchandise under review, the second asks about both categories, and the third asks only about subject merchandise. Mannesmann's Comments at 8. While the question asks for three types of information, Commerce is still quite correct, for Mannesmann's brief response dealt only with subject merchandise. Supplemental Section D Response at 7. The argument is defeated by reality; the question sought far more than Mannesmann gave.

**c**

**Mannesmann's Response to Question 11 of the Supplemental Section D Questionnaire Is Relevant to Commerce's Determination that Mannesmann Did Not Respond to the Best of its Ability**

Mannesmann further argues that the distinction between "subject merchandise" and "merchandise under review" is irrelevant for purposes of Question 11. Mannesmann's Comments at 9. It claims that the answer was the same no matter which term was used, that Commerce should have been able to figure that out from looking at other responses given by Mannesmann to other questions, and that therefore this cannot be considered an attempt to mislead or create confusion. Id.

25

While the answer might remain the same no matter which term is used, it is not Commerce's duty to search the record to deduce that answer. Yamaha Motor Co., Ltd. v. United States, 19 CIT 1349, 1359, 910 F.Supp. 679, 687 (1995) ("It is the respondent's obligation to supply Commerce with accurate information," and even if Commerce has the information on the record to rectify the respondent's error in its submission, the respondent cannot expect Commerce to correct its submissions and guarantee their accuracy.) The burden was on Mannesmann to create a record upon which Commerce could base its findings. Ta Chen, 1999 WL 1001194 at *13 ("Commerce grounds its argument on the truism that the respondent has the burden of creating an accurate record"); Chinsung Indus., 13 CIT at 106, 705 F.Supp. at 601 ("[I]f plaintiffs' argument were to prevail the result would be to . . . shift the burden of creating an adequate record from respondents to Commerce."). Therefore, the court finds that Mannesmann's response to Question 11 of the Supplemental Section D Questionnaire is relevant to the issue of Mannesmann's cooperation and supports Commerce's finding that Mannesmann failed to respond to the best of its ability.

**6**

**Commerce Does Not Bear the Burden of Piecing Together Evidence from the Record to Find the Information it Needs, and Mannesmann Does Bear the Burden of Fully Responding to Commerce's Questionnaires**

Mannesmann argues that Commerce's use of Question 12 of the Supplemental Section D Questionnaire as evidence of Mannesmann's non-cooperation is inappropriate. The question reads:

> Use the following headings to provide a chart which reports purchases of billets from *unrelated* suppliers, regardless of whether or not they are used in subject merchandise. (Unrelated

26

supplier, month during POR [period of review], billet grade, volume purchased, value of purchases [sic])

Supplemental Section D Questionnaire at 23 (emphasis in original).

The chart created by Mannesmann, Exhibit D-4, omitted the requested billet grade information. Supplemental Section D Response at Ex. D-4.

Mannesmann claims that it responded as best it could under the time constraints imposed upon it by Commerce and with the records that it kept. Mannesmann's Comments at 10. It further argues that evidence submitted in response to other questions could have been used by Commerce to figure out the complete response to Question 12. Id. at 11. Specifically, Mannesmann claims:

> The average billet price information that Mannesmann provided in Exhibit D-4 enabled the Department to determine that billet prices differed between purchases from affiliated and unaffiliated suppliers. . . . Mannesmann also specifically included information by which the Department could link the billet grades produced by Mannesmann's affiliated supplier, HKM, with billet grades purchased from Mannesmann's unaffiliated suppliers. Exhibit H-6 to the Department's Supplemental Section D Questionnaire, which was prepared in response to a related question by the Department about HKM billet grades, shows HKM's numeric grade code for each product it produced and provides a corresponding description of each grade. The accompanying descriptions include the grade information that appeared in the billet invoice from Mannesmann's unaffiliated supplier.

Id. (citations omitted).

Therefore, Mannesmann effectively argues, Mannesmann's own failure to fully respond to Question 12 is excused. Id. at 13.

27

The court finds Commerce acted reasonably when it relied on Mannesmann's failure to fully respond to Question 12 as evidence of Mannesmann's failure to act to the best of its ability. Mannesmann's claim that its records and the time allotted to it to reply were insufficient to allow a complete response involves the burden the law places on Mannesmann to create the record. If Mannesmann was having difficulty responding to Commerce's requests, it could have informed Commerce instead of silently resting on an inadequate response. See Remand Determination at 13 ("[I]f Mannesmann had any questions about Commerce's questionnaire . . . it was instructed to contact Commerce for clarification.").[3]

Indeed, to claim that because Commerce might have followed an information trail Mannesmann is somehow excused from answering Commerce's questions places the burden on Commerce of determining the correct responses. That is not the law; it is Mannesmann's burden to respond to Commerce's questionnaires and to develop the record. Ta Chen, 1999 WL 1001194 at *13; Chinsung Indus., 13 CIT at 106, 705 F.Supp. at 601.

---

[3]See Cover letter from Linda Ludwig, U.S. Dep't of Commerce to Mannesmann of 9/18/96, accompanying Antidumping Questionnaire Sections A, B, C, and D; Letter from Linda Ludwig, U.S. Dep't of Commerce to Mannesmann of 1/31/97; Cover letter from Chris Marsh, U.S. Dep't of Commerce to Mark D. Herlach of 4/18/97, accompanying Supplemental Section D Questionnaire; Cover letter from Chris Marsh, U.S. Dep't of Commerce to Mark D. Herlach of 6/13/97, accompanying Second Supplemental Section D Questionnaire (all instructing Mannesmann to contact Commerce with any questions).

Mannesmann's argument are unpersuasive, and Commerce's <u>Remand Determination</u> on the

valuation of the steel billet purchases and the affiliated party input adjustment is affirmed.[4]

---

[4]At oral argument Mannesmann raised <u>F.Lli De Cecco v. United States</u>, 216 F.3d 1027 (Fed. Cir. 2000). It argued that since Commerce had a duty to apply a reasonably accurate estimate of actual facts when applying an adverse inference, and Commerce had the actual facts before it (the sales prices on the purchases from HKM), it had not fulfilled its duty by applying the transaction value of the one purchase from an unrelated supplier to all of the billet purchases at issue.

In <u>F.Lli De Cecco</u>, the CIT had held the figure Commerce applied as adverse facts available was "thoroughly discredited and uncorroborated." <u>F.Lli De Cecco</u>, 216 F.3d at 1030 (quotations omitted). The Federal Circuit affirmed, noting that although "it is within Commerce's discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative . . . Commerce's discretion in these matters . . . is not unbounded." <u>Id</u>. at 1032. It said Congressional intent behind the adverse inference provision:

> ...is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins. . . . [Congress] intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin.

<u>Id</u>.

In <u>Mannesmann I</u>, the court discussed the facts applied by Commerce and held that a "rational relationship" existed between the data chosen by Commerce and the valuation of its purchases from HKM. <u>Mannesmann I</u> at 1318-19. Specifically, the court held that "a close nexus exists between the data chosen and the matter to which it applies since, essentially, Commerce did no more than use available record evidence of a market price to help it approximate other market prices." <u>Id</u>. at 1319. The court held that "should Commerce demonstrate on remand that the use of adverse best information available is still appropriate, the Court will sustain, as supported by sudstantial record evidence, the rationality of using the billet purchase (SPEC2H 61 and 62) from Vallourec as a means of determining market values for all of Mannesmann's billet purchases from HKM." <u>Id</u>. at 1319-20.

The discussion in <u>F.Lli De Cecco</u> warns against "unreasonably high rates with no relationship to the respondent's actual dumping margin." <u>F.Lli De Cecco</u>, 216 F.3d at 1032. The court has already held that a rational relationship exists, and Mannesmann's argument is unpersuasive.

**B**

**Commerce Applied Non-Adverse Facts Available to Adjust
Mannesmann's U.S. Duties As Ordered By This Court**

The court found in its earlier opinion that Commerce's use of facts available in adjusting

Mannesmann's reported U.S. duties paid was supported by substantial evidence, but its use of adverse

facts was not.  Mannesmann I at 1321.  On remand Commerce applied only reasonable facts available

without an adverse inference.  Remand Determination at 17.  That application of facts available is

supported by substantial evidence.

Mannesmann argues that Commerce did not actually apply non-adverse facts available, but

rather used adverse facts while claiming to apply non-adverse facts.  Mannesmann's Comments at 18.

Commerce's choice of facts available is discretionary.  Mannesmann I at 1322, 1325 n. 13.

See Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1189 (Fed. Cir. 1993) (referring to

agency's "broad discretion in selecting the best information available"); see also SAA at 869, 1994

U.S.C.C.A.N. at 4198.  As detailed above in Section III.B., Commerce averaged the per shipment

discrepancies between the reported U.S. duties paid and the actual U.S. duties paid without regard to

the weight of the shipments.  Remand Determination at 17-18.  It disregarded the weight because it

found no correlation between it and the discrepancies in duties paid.[5]  Id. at 18.

---

[5]    For example, the entry document for 6 sales observations (5,6,8-11) was for 74.93
tons and the discrepancy was 10 cents.  The entry document for 7 sales observations

Mannesmann argues that Commerce should have found an overall per ton discrepancy and applied that to the total tonnage not observed at verification without regard to the number of separate shipments involved. Id. at 18-19; Mannesmann's Comments at 18-19. It argues that weight of the shipments must be included in the analysis of the average discrepancy because duties are paid based upon weight. Mannesmann's Comments at 18.

While Mannesmann's proposed calculation may be reasonable, it is within Commerce's discretion to choose facts available. See Allied-Signal Aerospace, 996 F.2d at 1189. Given its finding that the weight of the shipment had no correlation to the discrepancy in the reported duty paid, Commerce based its analysis on per shipment deviation regardless of the weight of the shipments. Remand Determination at 18. The only argument Mannesmann presents against Commerce's facts applied is that its own set of facts leads to a better result for Mannesmann. Mannesmann's Comments at 18-21. While Mannesmann paid duties by the ton, and tonnage might be relevant to the calculation, Commerce's application of the average per shipment discrepancy is not unreasonable or unsupported by substantial evidence. Commerce has applied reasonable, non-adverse facts, as required by this court's previous order, and the court will not disturb Commerce's finding.

(45,46,49-51,53-54) was for 72.196 tons and the discrepancy was 64 cents. This demonstrates that for entries with similar tonnage there was a big different in the discrepancy and that right is not a factor in the amount of frequency of the discrepancy. . . For details of the calculations of the U.S. Duty amounts paid please see Analysis Memorandum for the Draft Remand.
Remand Determination at 18.

# V

## CONCLUSION

Commerce's use of adverse facts available in valuing Mannesmann's steel billets is supported by substantial record evidence and that Commerce's selected facts used in determining Mannesmann's U.S. duties are reasonable. The Remand Determination is affirmed in its entirety.

_____
Evan J. Wallach, Judge

Date:   October 5, 2000
        New York, New York