**Slip Op. 01-20**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
SEAH STEEL CORPORATION, LTD., :
:
Plaintiff, :
:
v. :
:    Court No. 00-04-00157
THE UNITED STATES, :
:    **Public**
Defendant, :    **Version**
:
and :
:
MAVERICK TUBE CORPORATION and LONE :
STAR STEEL COMPANY, INC. :
:
Defendant-Intervenors. :
_____ :


[ITA's antidumping determination affirmed.]

Dated: February 23, 2001


Kaye, Scholer, Fierman, Hays & Handler, LLP (Donald B. Cameron, Randi Turner and Deborah L. Wengel) for plaintiff.

Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch), William J. Kovatch, Jr., Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Schagrin Associates (Roger B. Schagrin) for defendant-intervenors.


## OPINION

**RESTANI, Judge:** This matter is before the court on a motion for judgment on the agency record pursuant to USCIT Rule 56.2,

brought by SeAH Steel Corporation ("SeAH" or "plaintiff"), the respondent in the underlying antidumping administrative review. SeAH challenges the date of sale determination made by the United States Department of Commerce ("Department" or "Commerce") in Oil Country Tubular Goods from Korea, 65 Fed. Reg. 13,364 (Dep't Comm. 2000) (final admin. rev.) [hereinafter "Final Results"]. Defendant-intervenors Maverick Tube Corporation and Lone Star Steel Company request that this court affirm the Department's determination.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). In reviewing final determinations in antidumping duty investigations, this court will hold unlawful those determinations of Commerce found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I. Facts**

In September of 1998, Commerce initiated an antidumping administrative review of oil country tubular goods ("OCTG") from Korea for the August 1997 through July 1998 period of review

-2-

("POR"). <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part</u>, 63 Fed. Reg. 51,893, 51,894 (Dep't Comm. 1998). When responding to the Department's initial questionnaire and first supplemental questionnaire, SeAH stated that invoice date was the appropriate date of sale for its third-country sales and provided Commerce with sample sales documentation to substantiate its claim. <u>See Supplemental Questionnaire Response</u> (Jan. 15, 1999), at 7 & Exh. A-26, C.R. Doc. 9, SeAH App., Tab CR 9, at 2 & Exh. A-26; <u>Section B Questionnaire Response</u> (Dec. 3, 1998), at 10, C.R. Doc. 5, SeAH App., Tab CR 5, at 3; <u>Section A Questionnaire Response</u> (Nov. 2, 1998), at A-18 & Exh. A-8, C.R. Doc. 2, SeAH App., Tab CR 2, at 2 & Exh. A-8. In its second supplemental questionnaire response, SeAH revised its earlier characterization of the date of sale, insisting that contract date was a more appropriate date of sale. <u>See</u> <u>Supplemental Questionnaire Response</u> (Mar. 19, 1999), at 17, C.R. Doc. 13, SeAH App., Tab CR 13, at 2. SeAH maintained its position on the proper date of sale for third-country sales in its third supplemental questionnaire response, but in responding to the Department's specific question regarding possible changes in the terms of the purchase order, SeAH acknowledged that the payment terms did change after the contract date for one of its third-country orders. <u>Supplemental Questionnaire Response</u> (June

10, 1999), at 4 & Exh. A-34, C.R. Doc. 15, SeAH App., Tab CR 15, at 2 & Exh. A-34.

Commerce determined for the preliminary results that the date of sale for third-country sales should be invoice date.  See Issues & Dec. Mem. to Final Results (March 13, 2000), at cmt. 1, C.R. Doc. 22, SeAH App., Tab CR22 at 2-7 [hereinafter Issues Mem.].  After briefing by all interested parties on the date of sale issue, Commerce maintained its determination that invoice date was the more appropriate date of sale for third-country sales.  See id.  The Department rejected SeAH's arguments based on the following observations:  (1)  respondent had failed to submit documentation sufficient to show that material terms of sale had not changed after the contract date; (2) the record revealed changes in material terms of sale, particularly payment terms for subject merchandise and other terms for non-subject merchandise; (3) lag times between contract date and invoice date, previously found to warrant contract date in another case, did not justify such a determination in the instant case; and (4) the circumstances surrounding the Asian financial crisis, which occurred in part during the POR, were insufficient under these facts to warrant departure from the presumption in favor of invoice date as the date of sale.  See id.

**II.  Analysis**

Pursuant to 19 C.F.R. § 351.401(i) (2000), the Department will "normally" employ the invoice date as the date of sale for the relevant product, if the invoice date is reflected in the respondent's business records. Commerce may apply a date of sale other than invoice date, however, if it is "satisfied" that another proposed date "better reflects" the date on which the "material terms of sale" are established. 19 C.F.R. § 351.401(i). Department practice has interpreted "material terms of sale" to include price, quantity, and payment terms. See, e.g., Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 65 Fed. Reg. 5554, 5575 (Dep't Comm. 2000) (final determ.) (payment terms); Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 64 Fed. Reg. 30,664, 30,679 (Dep't Comm. 1999) (final determ.) (price and quantity). The Department may exercise its discretion to rely on a date other than invoice date for the date of sale only if "material terms" are not subject to change between the proposed date and the invoice date, or the agency provides a rational explanation as to why the alternative date "better reflects" the date when "material terms" are established. See Thai Pineapple Canning Indus. Corp., Ltd. v. United States, No. 98-03-00487, 2000 WL 174986, at *2 (Ct. Int'l Trade 2000).

Commerce correctly applied its regulatory presumption in favor of invoice date when conducting its date of sale analysis

in this case.  Respondent's documentation "kept in the ordinary course of business," 19 C.F.R. § 351.401(i), identified invoice dates, which served as the presumptive basis for the date of sale.  See Supplemental Questionnaire Response (Jan. 15, 1999), at Exh. A-26, 14, 16-17, SeAH App., Tab CR 9, at Exh. A-26, 14, 16-17.  Applying this presumption, Commerce concluded that SeAH did not provide the agency with sufficient documentation to evaluate SeAH's claim that contract date "better reflects" the date of sale than invoice date.[1]  For example, the sales contract

[1]    Plaintiff claims that Commerce's reliance on invoice date, based in part on the lack of sufficient sales documentation, constituted an impermissible adverse inference in the absence of a finding that SeAH had been uncooperative.  See Pl.'s Br. at 16 n.9.  Plaintiff misunderstands the nature of the regulatory presumption in 19 C.F.R. § 351.401(i).  Unlike the situation warranting the application of adverse facts available pursuant to 19 U.S.C. § 1677e(b), the Department here did not penalize respondent for its failure to submit properly requested information that was necessary for the agency to perform its dumping analysis.  Cf. Mannesmannrohren-Werke AG v. United States,  120 F. Supp. 2d 1075, 1081-87 (Ct. Int'l Trade 2000) (upholding application of adverse facts available because respondent failed to act to best of its ability in responding to agency's request for information).  Rather, the plain language of 19 C.F.R. § 351.401(i) puts on notice the party seeking to avoid use of invoice date as the date of sale, whether petitioner or respondent, that such party must bring to the agency's attention sufficient information to "satisfy" the Department that an alternative date "better reflects" the date upon which material terms were established.  See Allied Tube & Conduit Corp. v. United States, No. 99-11-00715, 2001 WL 47002, *3-4 (Ct. Int'l Trade 2001).  See also Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,348-49 (Dep't Comm. 1997) [hereinafter Final Rule].  Where, as here, the party proposing an alternative date provides the Department with insufficient documentation for the agency to determine whether material terms were established at an earlier date, Commerce may (and indeed must) rely on

(continued...)

-6-

identified the quantity of total OCTG requested by SeAH's customer, without regard to size specifications. See Supplemental Questionnaire Response (Jan. 15, 1999), at Exh. A-26, 6-7, SeAH App., Tab CR 9, at Exh. A-26, 6-7. The corresponding invoices, however, were itemized to reflect delivered quantities of OCTG of specific size as opposed to an aggregate quantity of OCTG. See id. at Exh. A-26, 14, 16-17, SeAH App., Tab CR 9, at Exh. A-26, 14, 16-17. The Department could not determine from this information whether the quantities ordered of size-specific OCTG had remained the same from the contract date to the invoice date. Similarly, while respondent's submissions included documentation from shipments made in two months, the sales contract had specified that shipments were to be during four months. Compare id. at Exh. A-26, 7, SeAH App., Tab CR 9, at Exh. A-26, 7 (identifying four months of delivery) with id. at Exh. A-26, 14, 16-17, SeAH App., Tab CR 9, at Exh. A-26, 14, 16-17 (identifying two delivery months). A complete comparison of the sales contract's material terms with those found in the invoices could not have been achieved without the additional two months' invoices.[2] Respondent's failure to

_____

(...continued)
invoice date pursuant to 19 C.F.R. § 351.401(i). Such reliance does not contravene the requirements of 19 U.S.C. § 1677e(b) (adverse facts available provision).

[2] Because respondent was attempting to prove a negative,

(continued...)

provide the agency with sufficient documentation to evaluate whether material terms of sale changed after contract date supports the Department's reliance on the presumptive date of sale.

Even the incomplete documentation submitted by SeAH reflects variances in the material terms of sale after the contract date.[3] First, in a fax transmitted subsequent to the signing of the sales contract, one of SeAH's customers changed the quantity of non-subject merchandise[4] ordered under the sales contract. Compare id. at Exh. A-26, 6, SeAH App., Tab CR 9, at Exh. A-26, 6 (contractually-agreed quantities) with id. at Exh. A-26, 4-5,

---

(...continued)
i.e., no material changes, more complete documentation was required.

[3]     The Department notes in its brief before this court that the submitted sales documentation also reveals a change in delivery dates. See Def.'s Br. at 15.  Commerce already has determined specifically that delivery dates do not constitute "material terms of sale" in the absence of specification otherwise by the parties, and the agency has provided no explanation for its change in characterization now. See Stainless Steel Bar from India, 62 Fed. Reg. 4029, 4030 (Dep't Comm. 1997) (final new shipper admin. rev.).  In any event, because Commerce did not specify the changed delivery dates as a basis for its decision, it may not now rely on this factor as a rationale for its determination. See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

[4]     The sample contract provided in SeAH's sales documentation covered sales of subject and non-subject merchandise.  See Supplemental Questionnaire Response (Jan. 15, 1999), at Exh. A-26, 6-7, SeAH App., Tab CR 9, at Exh. A-26, 6-7.

-8-

SeAH App., Tab CR 9, at Exh. A-26, 4-5 (fax from customer specifying quantity changes). The requested changes in quantity significantly exceeded the tolerance levels specified in the sales contract.[5] Notwithstanding plaintiff's attempt to characterize the faxed changes as simply an "amendment to the contract," Pl.'s Br. at 21 n.13, and therefore not a change warranting use of invoice date as the date of sale, such post-contract modifications are precisely the sort of "amendments" that form the basis of the Department's regulatory presumption in favor of invoice date.[6] Second, at the request of one of its

---

[5] The sales contract permitted deviations of [     ]% and [   ]%, whereas the quantity changes requested by SeAH's customer included one of [    ]% and one of [    ]%. Compare id. at Exh. A-26, 8, SeAH App., Tab CR 9, at Exh. A-26, 8 (contractually-permitted variances) with id. at Exh. A-26, 5, SeAH App., Tab CR 9, at Exh. A-26, 5 (requested quantity changes).

[6] SeAH seeks to have the agency and the court overlook the noted quantity change because it was "accomplished by an amendment to the contract, not simple invoicing, as is presumed by use of invoice date." Pl.'s Br. at 21 n.13. Respondent is incorrect that the regulatory presumption of invoice date is based on the invoice itself necessarily changing the material terms of sale in any given instance. Rather, use of invoice date reflects the possibility that producers and customers may alter the material terms of sale up at any point after contract date and until invoicing. As the Department noted in its Preamble to the final regulations,

> [i]n the Department's experience, price and quantity are often subject to continued negotiation between the buyer and seller until a sale is invoiced. The existence of an enforceable sales agreement between the buyer and the seller does not alter the fact that, as a practical matter, customers frequently change their

(continued...)

customers, SeAH permitted a change in payment terms between the contract date and invoice date.[7]  See Supplemental Questionnaire Response (June 10, 1999), at 4 & Exh. A-34, C.R. Doc. 15, SeAH App., Tab CR 15, at 2 & Exh. A-34.  These post-contract changes in material terms of sale further support the agency's choice of invoice date as the date of sale.[8]

Commerce further argues that its date of sale determination was "necessary to maintain administrative consistency."  Def.'s

---

[6](...continued)
minds and sellers are responsive to those changes.  The Department also has found that in many industries, even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not finally established until the sale is invoiced.

Final Rule, 62 Fed. Reg. at 27,348-49.  SeAH has failed to adduce any evidence on record to establish that material terms would not change beyond contract date.

[7]    The [                    ] sales contract provided that payment would be made by [                    ].  See Supplemental Questionnaire Response (Jan. 15, 1999), at Exh. A-26, 7, SeAH App., Tab CR 9, at Exh. A-26, 7.  On [          ], SeAH's customer sent a memo to SeAH seeking [

          ], which request was granted by SeAH. Supplemental Questionnaire Response (June 10, 1999), at 4 & Exh. A-34, C.R. Doc. 15, SeAH App., Tab CR 15, at 2 & Exh. A-34.


[8]  SeAH insists that the "unusual circumstances" of this case, particularly the onset of the Asian financial crisis and the long lag times between contract date and invoice date, warrant reliance on the contract date as the date of sale.  Pl.'s Br. at 21-28.  Whether the combination of such factors could have allowed a determination in favor of the contract date, they cannot be said to compel the Department to make such a determination and render its conclusion in this case unsupported by substantial evidence.

Br. at 18. The Department notes that because it has relied on invoice date in prior administrative reviews concerning SeAH, changing date of sale determinations from one review to the next would encourage manipulation by respondent. Specifically, certain sales delivered (i.e., invoiced) at the beginning of the POR under review (August 1997 through July 1998) may have been made pursuant to a contract signed during the prior POR (August 1996 through July 1997). Those sales were excluded from the dumping calculation for the previous administrative review because the agency had determined that invoice date was the proper date of sale. If the Department were to conclude now that contract date was the appropriate date of sale for this review, those sales made pursuant to a contract from the previous review, but shipped during the present POR, effectively would be excluded from review for purposes of dumping margin calculations. Therefore, the Department argues, it was "required to utilize invoice date in this administrative review." Def.'s Br. at 20.

This policy argument does not support the use of invoice date in this case. The date of sale determination inherently places certain sales outside the scope of the POR that would have been examined in the present review had an alternative date of sale been utilized. It does not follow from this self-evident characteristic of date of sale analysis, however, that Commerce is "required" to employ the same date of sale in an ongoing

-11-

review as it had relied upon in a previous review. First, there is no requirement that all sales be examined by means of a series of reviews. Second, such a requirement would obviate the need for any date of sale analysis in all reviews beyond the first administrative review. A date of sale analysis is essential in each review "to guarantee that [Commerce] makes the fair value comparison on a fair basis — comparing apples with apples." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994) (quoting Smith-Corona Group v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984)). The Department, under the guise of "administrative consistency," may not thus abdicate its statutory duty to ensure that normal value is calculated "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(A).

Plaintiff additionally argues that Commerce's finding of contract date as the date of sale under "virtually identical" facts in Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 63 Fed. Reg. 32,833, 32,835-36 (Dep't Comm. 1998) (final determ.) [hereinafter "Circular Welded Pipe"], requires a similar conclusion in this case. Pl.'s Br. at 24-25. If an agency departs from prior decisions, it must provide a rational explanation for doing so. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. Of Trade, 412 U.S. 800, 808 (1973) ("Whatever

the ground for the departure from prior norms, . . . it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate."). In <u>Circular Welded Pipe</u>, the Department used contract date as the date of sale for U.S. sales because of a significant lag time between contract date and invoice date, even though changes in terms of sale were made after the contract date. 63 Fed. Reg. at 32,836. Commerce reasoned that the changes were "usually immaterial . . . or, if material, rarely occur[red]." <u>Id.</u>

Here, Commerce attempted to distinguish <u>Circular Welded Pipe</u> as follows:

> While the Department [in <u>Circular Welded Pipe</u>] did allude to long lag periods between contract date and invoice date, the discussion involved [respondent's] U.S. sales. For the instant review, only the third-country comparison market sales are at issue. Here, we note that periods between contract date and invoice date varied widely, with "long" lag times not necessarily representative of [respondent's] third-country sales.

<u>Issues Mem.</u> at cmt. 1. Such a rationale for distinguishing <u>Circular Welded Pipe</u> is meaningless. Rationally, the selection of date of sale cannot rest on the distinction between U.S. sales and third country (or home market) sales; the geographical location of a respondent's sales has no bearing on when the material terms of sale were established between the respondent

-13-

and its customers.[9]  Therefore, the court does not rely on the agency's explanation for refusing to adhere to its determination in Circular Welded Pipe.  See Atchison, 412 U.S. at 811-17 (rejecting insufficient agency explanation for deviation from prior decisions).

In any case, whether or not the material facts in Circular Welded Pipe are "virtually identical" to those in the instant case, the court would find the rejection of the regulatory presumption in favor of invoice date on such facts inadequately supported.  See Service v. Dulles, 354 U.S. 363, 386-89 (1957) (agency bound to comply with its regulations).  Where the record reveals some change in material terms of sale subsequent to the contract date and less than full documentation by respondent, the presence of lag times between contract date and invoice date do not, without further explanation, warrant substitution of contract date for the presumptive date of sale as mandated by 19 C.F.R. § 351.401(i).[10]  Therefore, remand for harmonization with Circular Welded Pipe is not required.

---

[9]  It is also unclear why the "long" lag times are "not necessarily representative," whereas they apparently were sufficiently representative in Circular Welded Pipe to justify the use of contract date.

[10]  Commerce previously has considered lag times between invoice and shipment dates, see, e.g., Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608, 56,611 (Dep't Comm. 1996) (prelim. determ.), but has never explained why lag times between contract and invoice date, by themselves, would warrant abandonment of the presumption.

## Conclusion

Plaintiff's sales documentation did not provide enough information for the Department to evaluate whether, as plaintiff claimed, materials terms were in fact established on the contract date. Furthermore, the documentation that plaintiff did submit revealed changes in the material terms of sale subsequent to the contract date. Therefore, notwithstanding the Department's apparently erroneous conclusions in a previous determination under possibly similar facts and its flawed policy argument, the court finds Commerce's reliance on the presumptive date of sale, i.e., invoice date, supported by substantial evidence and affirms the agency's date of sale determination.

_____

Jane A. Restani

Judge

DATED: New York, New York

This 23rd day of February, 2001