**Slip Op. 01-52**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| NIPPON STEEL CORPORATION, | : | |
| Plaintiff, | : | |
| v. | : | |
| THE UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., LTV STEEL COMPANY, INC.; GALLATIN STEEL, IPSCO STEEL, INC., STEEL DYNAMICS, INC., and WEIRTON STEEL CORPORATION, | : | |
| Defendant-Intervenors. | : | Consolidated Court No. 99-08-00466 |
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., and LTV STEEL COMPANY, INC. | : | **Public Version** |
| Plaintiffs, | : | |
| v. | : | |
| THE UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| NIPPON STEEL CORPORATION, | : | |
| Defendant-Intervenor. | : | |

[ITA Remand Determination Remanded.]

Dated: April 20, 2001

Gibson, Dunn & Crutcher LLP (Daniel J. Plaine, Gracia M. Berg, Merritt R. Blakeslee, and Seth M. M. Stodder) for plaintiff Nippon Steel Corporation.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer and John J. Mangan) for plaintiffs Bethlehem Steel Corporation, U.S. Steel Group, a unit of USX Corporation, Ispat Inland, Inc. and LTV Steel Company, Inc.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kyle E. Chadwick), John D. McInerney, Elizabeth C. Seastrum, and Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Schagrin Associates (Roger B. Schagrin) for defendant-intervenors Gallatin Steel, IPSCO Steel, Inc., Steel Dynamics, Inc. and Weirton Steel Corp.

## OPINION

**RESTANI, Judge:** This challenge to Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't Comm. 1999) (final admin. rev.) ["Final Results"] is before the court following a remand determination ("Remand Determ.") by the United States Department of Commerce ("Commerce" or "the Department"). Plaintiff Nippon Steel Corporation ("NSC"), one of the respondents in the underlying antidumping duty investigation, argues that (1) the Department has failed to implement properly this court's injunction regarding the placement on record of memoranda on ex parte meetings, and (2)

the Department continues to rely impermissibly on adverse facts

available without adequately supporting the requisite finding

that NSC "failed to cooperate by not acting to the best of its

ability." 19 U.S.C. § 1677e(b) (1994). Familiarity with the

opinion ordering remand is presumed. See Nippon Steel Corp. v.

United States, 118 F. Supp. 2d 1366 (Ct. Int'l Trade 2000)

("Nippon I").

## I. *Ex Parte* Meetings

In its earlier opinion, the court found that Commerce

violated 19 U.S.C. § 1677f(a)(3) because the Department had

failed to place in the administrative record any memoranda

recording the agency's *ex parte* meetings with petitioners. See

id. at 1372-74. The court therefore ordered the Department to

> issue instructions that *ex parte* memoranda required by
> 19 U.S.C. § 1677f(a)(3) will be drafted expeditiously
> in all cases, reviewed by a person in attendance at the
> meeting, and placed in the record as soon as possible,
> so that parties may comment effectively on the factual
> matters presented. The memoranda are required whether
> or not the factual information received was received
> previously, is expected to be received later in the
> proceedings, or is expected to be used or relied on.

Id. at 1374. Commerce attempted to comply with this court's

injunction by circulating a policy statement on *ex parte*

memoranda to Import Administration staff. See Def.'s Reply Br.

at 13 & Attach. Because that statement was not published and

apparently failed to include all the stated elements of the

court's instruction, NSC challenged the Department's policy statement as inconsistent with the court's injunction. The court subsequently issued an Order to Show Cause as to why the Assistant Secretary for Import Administration should not be held in contempt for not obeying in full the court's injunction. At the show cause hearing on February 15, 2001, while maintaining that the injunction had been obeyed, representatives from the Department agreed to comply more fully with the court's injunction and to take additional measures to ensure that all Commerce officials were aware of their statutory obligations under 19 U.S.C. § 1677f(a)(3).

On March 28, 2001, the Department published in the Federal Register a revised policy statement. See Policy Statement Regarding Issuance of Ex Parte Memoranda, 66 Fed. Reg. 16,906 (Dep't Comm. 2001). This policy statement is also available on the Web site of the International Trade Administration, at http://ia.ita.doc.gov/policy/ex-parte-memo.htm. Upon reviewing the Department's statement, the court finds that the agency has complied with the court's injunction in Nippon I.

## II.  Use of Adverse Facts Available

A cooperating respondent's failure simply to respond completely or correctly to the Department's *initial* request for specific information does not warrant resort by the agency to

facts otherwise available under 19 U.S.C. § 1677e(a)(2)(B).  See

19 U.S.C. §§ 1677e(a); 1677m(d).  See also Ta Chen Stainless

Steel Pipe, Inc. v. United States, No. 97-08-01344, 1999 WL

1001194, at *17 (Ct. Int'l Trade 1999) ("Ta Chen I").  If a

cooperating respondent fails to respond adequately to Commerce's

supplemental request for information, the Department may then use

facts otherwise available in lieu of missing or incomplete data.

See 19 U.S.C. §§ 1677e(a); 1677m(d).  See also NTN Bearing Corp.

v. United States, No. 97-10-01801, 2001 WL 180255, at *7 (Ct.

Int'l Trade 2001); SKF USA Inc. v. United States, 116 F. Supp. 2d

1257, 1268 (Ct. Int'l Trade 2000).  "Once Commerce has determined

under 19 U.S.C. § 1677e(a) that it may resort to facts available,

it must make additional findings prior to applying 19 U.S.C. §

1677e(b) and drawing an adverse inference."  Ferro Union, Inc. v.

United States, 44 F. Supp. 2d 1310, 1329 (Ct. Int'l Trade 1999)

("Ferro Union I").[1]  Where, as here, a respondent gives an

incorrect response to one of the Department's requests for

information in an original and one supplemental questionnaire,

such error may justify reliance on facts otherwise available

under 19 U.S.C. § 1677e(a)(2)(B), but does not suffice, in the

absence of further evidence, to permit an adverse inference to be

_____

    [1]    See also Mannesmannrohren-Werke AG v. United States, 77
F. Supp. 2d 1302, 1315-16 (Ct. Int'l Trade 1999) ("Mannesmann
I"); Borden, Inc. v. United States, 4 F. Supp. 2d 1221, 1246-47
(Ct. Int'l Trade 1998) ("Borden I"), rev'd on other grounds, No.
99-1575, 2001 WL 312232 (Fed. Cir. Mar. 12, 2001).

drawn against the respondent.  See Nippon I, 118 F. Supp. 2d at
1377-79.

The Department, therefore, must cite factors beyond NSC's
failure to respond correctly to the agency's two requests for the
weight conversion factor.  In its remand determination, Commerce
attempts to support its application of adverse facts available
against NSC with the following observations: (1) NSC has had
significant experience with antidumping proceedings; (2) NSC
provided "incorrect" responses when the Department asked
repeatedly for the weight conversion factor because NSC failed to
make the requisite internal inquiries to retrieve the requested
information; and (3) the weight conversion factor was within
NSC's control, and NSC was therefore fully capable of complying
with the Department's requests.  Because these observations still
do not support a finding that NSC's actions rose above "a simple
mistake," id. at 1379, the Department's determination is
unsupported by substantial evidence.

**A.   Evidence Cited by Commerce to Support the Use of Adverse
Facts Available**

First, NSC's status as "one of the most successful and
sophisticated steel companies in the world [with] significant
prior experience with dumping proceedings," Remand Determ. at 3,
is irrelevant to whether NSC acted to the best of its ability in

this case.  This is not a case where the Department points to the respondent's prior participation in dumping proceedings as a basis for rejecting data that fails to satisfy the Department's procedures or standards for the submission of data.[2]  Nor is this a case where the Department highlights an error made by the respondent in a previous review and which the respondent continues to make in the current review, as evidence of the respondent's unwillingness to comply with the Department's requests for information.[3]  Rather, Commerce here seeks to base its evaluation of NSC's failure to submit a weight conversion factor, in part, on NSC's experience as a respondent in dumping proceedings.  A generalized familiarity with antidumping proceedings, however, cannot support a finding that NSC did not cooperate to the best of its ability because it failed to provide

---

[2]      Cf. Heveafil Sdn. Bhd. v. United States, No. 98-04-00908, 2001 WL 194986, at *4 (Ct. Int'l Trade 2001) (rejecting documentation submitted during verification because it was not "maintained in the ordinary course of business"); Gourmet Equip. (Taiwan) Corp. v. United States, No. 99-05-00262, 2000 WL 977369, at *4-5 (Ct. Int'l Trade 2000) (rejecting submission of unverifiable data).

[3]      Cf. Chrome-Plated Lug Nuts from Taiwan, 64 Fed. Reg. 17,314, 17,316 (Dep't Comm. 1999) (final admin. rev.) ("Gourmet has been aware of, but has not corrected, deficiencies in its accounting system even though these deficiencies caused the Department to use facts available for the last several administrative reviews."), aff'd, Gourmet Equip., 2000 WL 977369, at *4-5.

the answer to one esoteric question posed by the Department.[4]  In

this facts available context, generic experience as a respondent

offers no insight into NSC's actions during the current

proceeding.  The department has not shown, for example, that the

inadvertence claimed in this case also occurred in another

review, or that the specific element focused on in a previous

review (e.g., weight conversion factor, major input valuation) is

also at issue in this case.  To allow the Department to draw

detailed conclusions about respondent because of its generalized

knowledge would improperly penalize now those firms that had been

the subject of antidumping actions previously.

Second, in reiterating NSC's failure to provide the weight

conversion factor, the Department conflates the prerequisites for

use of facts available with the additional findings necessary to

warrant an adverse inference.  See Remand Determ. at 4-5 (citing

respondent's inaccurate responses to original and supplemental

questionnaire as support for adverse inference); Def.'s Reply Br.

at 6 (same).  Commerce's reasoning in this regard is encapsulated

in the following paragraph from the Remand Determination:

> A "reasonable respondent," acting to the "best of its
> ability" to comply with the Department's request for
> [weight conversion factors], would minimally have

_____

[4]    See Taiwan Semiconductor Indus. Ass'n v. United States,
105 F. Supp. 2d 1363, 1379 (Ct. Int'l Trade 2000) (agency
determination not sustained where agency "failed to articulate a
'rational connection between the facts found and the choice
made'") (citations omitted) .

contacted the factory, where the steel coils were
produced and where weighing was most likely to take
place, to determine whether they were weighed and the
weight data maintained.  A "reasonable respondent"
would have attempted to obtain the data when it was
first requested, or at least when it was requested for
the second time, rather than telling the Department,
without any factual basis to support such a claim, that
the respondent did not believe the Department needed
the information.  With respect to this issue, NSC was
not acting as a "reasonable respondent" nor was it
acting "to the best of its ability," as required by the
statute.

Remand Determ. at 5.  In other words, according to the

Department, NSC did not respond accurately or in a timely fashion

to the Department's questionnaire[5] because the company did not

make the proper inquiries of its factory employees, and this

error reflects NSC's failure to act "to the best of its ability."

The fact that NSC did not make appropriately timely submissions

as a result of inadequate inquiries, however, only provides

sufficient basis for the use of facts available pursuant to 19

---

[5]     NSC claims that the Department did not properly request
the correct weight conversion data in its supplemental
questionnaire.  In particular, NSC notes that the Department
requested the weight conversion factors "in [NSC's] *home market
sales listing*."  NSC Obj. at 4 n.1 (quoting Supplemental
Questionnaire, Field 16.1 (emphasis added)).  The relevant weight
conversion data necessary for the Department to perform its
comparison, however, was for NSC's *U.S. sales*.  Because
Commerce's adverse inference was based on the lack of weight
conversion data for *U.S. sales*, which the agency had only
requested in its original questionnaire, NSC seems to suggest
that the Department had not properly sought the information from
NSC before applying adverse facts available.  Because NSC failed
to raise this argument in its original pleadings in this action,
and appears to have failed to raise it at the agency level, the
court does not address this argument.

U.S.C. § 1677e(a)(2)(B).  The Department's explanation for its adverse inference is thus merely a more detailed restatement of the finding[6] that NSC "fail[ed] to provide [necessary information] by the deadlines for submission."  19 U.S.C. § 1677e(a)(2)(B).  Commerce may not in this manner "simply repeat[] its 19 U.S.C. § 1677e(a)(2)(B) finding, using slightly different words," in lieu of making the requisite additional findings before drawing an adverse inference.  Borden I, 4 F. Supp. 2d at 1246.  See also Ferro Union I, 44 F. Supp. 2d at 1329-31.

Third, Commerce emphasizes the existence of the requested weight conversion data at NSC's factories as further evidence in support of the agency's adverse inference.  The Department is undoubtedly correct that, as the court has noted previously, "it is reasonable to charge a respondent with full knowledge of its own operations."  Def.'s Reply Br. at 6 (citing Mannesmannrohren-Werke AG v. United States, 120 F. Supp. 2d 1075, 1083 (Ct. Int'l Trade 2000) ("Mannesmann II")).  The failure to provide information otherwise readily available within the scope of a respondent's business operations may be relevant to determining a respondent's threshold *ability to comply* with its statutory

---

[6]    NSC does not contest the propriety of this finding or the Department's reliance on (non-adverse) facts available. While Commerce could have waived the deadline and accepted the information, it was not required to do so.  Commerce remains free to use NSC's data or other non-adverse data, as it deems appropriate.

obligations.  <u>Mannesmann II</u>, 120 F. Supp. 2d at 1083.

Nevertheless, this does not explain whether a respondent may have

committed an excusable inadvertence or failed to act as a

reasonable respondent should.

In the absence of additional evidence supporting a finding

that a respondent "failed to cooperate by not acting to the best

of its ability," where a claim of inadvertence is at issue, the

simple fact of a respondent's failure to report information

within its control does not warrant an adverse inference.[7]  The

court in <u>Mannesmann II</u> upheld the Department's resort to adverse

facts available in the context of other, more revealing factors:

the Department had provided Mannesmann with an original and *two*

supplemental questionnaires, <u>id.</u> at 1078; respondent had offered

answers that were non-responsive (i.e., unverifiable, in the

wrong form, incomplete) to *four* questions in the course of

addressing those requests for information, thereby establishing a

"pattern of unresponsiveness," <u>id.</u> at 1077-80, 1084-87; and

additional evidence strongly indicating a specific intent on the

part of the respondent to evade the Department's requests for

---

[7]     <u>Cf.</u> <u>Ta Chen Stainless Steel Pipe, Inc. v. United
States</u>, No. 97-08-01344, 2000 WL 1225799, at *2-3 (Ct. Int'l
Trade 2000) ("<u>Ta Chen II</u>") (adverse inference upheld where, in
addition to respondent's having access to data requested from
affiliate, Commerce noted that respondent had provided other
confidential data from affiliate, and that respondent did not
fulfill its responsibility to maintain records relevant to
administrative review).

information.[8]  This case, in contrast, presents no such

additional probative factors to support Commerce's finding that

NSC's actions "constitute[] anything more than an inadvertent

error."  Mannesmann I, 77 F. Supp. 2d at 1316.[9]

In justifying its conclusion that NSC had "failed to

cooperate by not acting to the best of its ability," Commerce has

---

[8]     Specifically, Commerce noted (1) that the respondent sought to re-frame the question posed by the Department through selective reference to the questionnaire's definition section, and (2) that an official working for the respondent acknowledged facts that were patently inconsistent with certain questionnaire responses, and the same official admitted that he had been involved in the preparation of those questionnaire responses. See Mannesmann II, 120 F. Supp. 2d at 1078-79.

[9]     In a supplemental filing, NSC urged this court to consider the recent decision of a WTO dispute settlement panel. The decision arose from the instant underlying investigation and addressed the same challenge to the Department's use of adverse facts available raised by NSC in this case.  See United States – Anti-Dumping Measures on Certain Hot-Rolled Steel Products from Japan, WT/DS184/R, at ¶¶ 7.31-7.57  (Feb. 28, 2001), available at http://www.wto.org/english/tratop_e/ dispu_e/distab_e.htm.  The court does not find the reasoning of the WTO panel relevant to the issue here.  The WTO panel held that, under the relevant WTO law, an investigating authority may not refuse to consider untimely submitted factual information, provided that the information was submitted with sufficient time to allow for verification of the new data.  See id. at ¶ 7.55.  As a result, the panel found that the Department should not have resorted to facts available at all, but instead, should have relied on the late data in calculating NSC's dumping margin.  See id. at ¶ 7.57.  Whatever the merits of this holding in light of WTO rules, it plainly contradicts the applicable statute, which permits the agency to employ at least non-adverse facts available under these circumstances.  See 19 U.S.C. § 1677e(a)(2)(B).  See also Nippon I, 118 F. Supp. 2d at 1377 (citing Seattle Marine Fishing Supply Co. v. United States, 12 CIT 60, 71, 679 F. Supp. 1119, 1128 (1988)).  The panel decision therefore has no bearing on the propriety of the Department's resort beyond facts available to the drawing of an adverse inference.

insufficiently explained how NSC's actions fall "below the standard for a reasonable respondent." Nippon I, 118 F. Supp. 2d at 1379.[10] The record reveals that NSC made significant efforts throughout the investigation to satisfy the Department's requests for information, producing voluminous submissions within the narrow time frame of the investigation. NSC's efforts must also be viewed in the context of what the Department recognized as a difficult case raising "unique and complex issues." Respondent Selection Mem. (Oct. 30, 1998), at 3, P.R. Doc. 62. Admittedly, NSC failed to provide Commerce with the weight conversion factor at the time requested, despite having the information within the company's control. Nevertheless, when NSC did provide the weight conversion data, ten days after issuance of the preliminary results, its delay was not so great as to hinder the progress of the investigation. Cf. Roller Chain, Other Than Bicycle from Japan, 63 Fed. Reg. 63,671, 63,674-75 (Dep't Comm. 1998) (final admin. rev.) (finding continuous errors made by respondent

---

[10]    Commerce rejects this standard and seeks to apply a pure "ability to comply" standard, but a completely errorless investigation is simply not a reasonable expectation. Even the most diligent respondents will make mistakes, and Commerce must devise a non-arbitrary way of distinguishing among errors. See F. Lli De Cecco Di Filippo Fara San Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Commerce's discretion [when drawing adverse inferences] is not unbounded."). See also Bowe-Passat v. United States, 17 CIT 335, 343 (1993) ("This predatory 'gotcha' policy does not promote cooperation or accuracy or reasonable disclosure by cooperating parties intended to result in realistic dumping determinations.").

throughout investigation, "the magnitude of which prevented the Department from using [respondent's] information in the margin calculations").

In cases where a respondent claims an *inability* to comply with the agency's requests for information, the Department may permissibly draw an adverse inference upon a reasonable showing that the respondent, in fact, could have complied.  See, e.g., Ta Chen II, 2000 WL 1225799, at *3; Kawasaki Steel Corp. v. United States, 110 F. Supp. 2d 1029, 1036-38 (Ct. Int'l Trade 2000). Here, however, where the respondent acknowledges the ability to comply, but claims it did not do so because of simple inadvertence, the Department must show more.  As the court observed in its opinion ordering remand, those cases that do not suggest willfulness on the part of the respondent pose particular challenges for the Department to draw appropriate lines in order to determine whether to draw an adverse inference.  See Nippon I, 118 F. Supp. 2d at 1378-79.  Perhaps in light of such challenges, the Department has understandably resisted attempts to establish definitive rules, proceeding instead to make "[t]he determination of whether a company has acted to the best of its ability . . . on a fact- and case-specific basis."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,340 (Dep't Comm. 1998) (final rule).  In doing so, however, the Department risks the appearance of acting arbitrarily as to when it forgives

respondents and when it penalizes them.[11]  This the Department

cannot do.  See Olympic Adhesives, Inc. v. United States, 899

F.2d 1565, 1572 (Fed. Cir. 1990) (quoting Atlantic Sugar, Ltd. v.

United States, 744 F.2d 1556, 1560 (Fed. Cir. 1984)) ("[T]he ITA

has not been given power that can be 'wielded' arbitrarily as an

'informal club.'").  Commerce should therefore seek greater

coherence and consistency in its application of adverse facts

available against respondents claiming simple error.


**B.  Impact on NSC's Dumping Margins**

Finally, the parties dispute the relevance of any impact the

missing weight conversion data may have had on NSC's final margin

calculations.[12]  Commerce argues that it is precluded from

---

[11]     Compare Stainless Steel Bar from India, 65 Fed. Reg.
3662, 3664-65 (Dep't Comm. 2000) (final new shipper rev.)
(refusing to apply adverse facts available where respondent
provided untimely data because data was verifiable, complete,
easily usable, and respondent "misunderstood" reporting
instructions), and Circular Welded Non-Alloy Steel Pipe from the
Republic of Korea, 63 Fed. Reg. 32,833, 32,837 (Dep't Comm. 1998)
(final admin. rev.) (refusing to apply adverse facts available
where respondent provided untimely data because errors
"affect[ed] only a minuscule number of transactions and
appear[ed] to be inadvertent"), with Final Results, 64 Fed. Reg.
at 24,360-61 (applying adverse facts available despite verifiable
and complete data submission, and minimal impact of error).

[12]     In responding to this issue raised by NSC in its remand
case brief, Commerce properly recognizes that "[i]nformation
necessary to the calculation of an antidumping duty margin is
important whether it raises or lowers the margin."  Remand
Determ. at 9.  The relative importance of information sought by
the Department, however, is separate from the possible benefit a
                                                    (continued...)

evaluating the effects of the missing data because, pursuant to

19 C.F.R. § 351.104(a) (2000),[13] the untimely submission of NSC's

---

[12](...continued)
respondent may have gained by failing (intentionally or
inadvertently) to provide data needed by the agency. Requiring
Commerce to examine whether a respondent would benefit from its
errors does not undermine or contradict the importance the agency
may reasonably ascribe to a particular piece of requested data.

[13]    Section 351.104(a) of Title 19 of the Code of Federal
Regulations provides, in relevant part, as follows:

   (1)   . . . The Secretary will include in the official
         record all factual information, written argument,
         or other material developed by, presented to, or
         obtained by the Secretary during the course of a
         proceeding that pertains to the proceeding.

                    *               *               *

   (2)   *Material returned.*

      (i)   The Secretary, in making any determination
            under this part, will not use factual
            information, written argument, or other
            material that the Secretary returns to the
            submitter.

      (ii)  The official record will include a copy of a
            returned document, solely for purposes of
            establishing and documenting the basis for
            returning the document to the submitter, if
            the document was returned because:

         (A)  The document, although otherwise timely,
              contains untimely filed new factual
              information . . .

                    *               *               *

      (iii)  In no case will the official record include
             any document that the Secretary returns to
             the submitter as untimely filed, or any
             unsolicited questionnaire response . . . .

weight conversion factor was not a part of the record before the agency and therefore may not serve as a basis for the Department's decision on adverse inferences.  See Remand Determ. at 9 & n.3; Def.'s Reply Br. at 11-12.  The Statement of Administrative Action, however, dictates otherwise:

> Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.  In employing adverse inferences, one factor the agencies will consider is the extent to which a party may benefit from its own lack of cooperation.

SAA, at 870, H.R. Rep. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4199.  This language reveals that Commerce is to utilize adverse facts available when the respondent's failure to cooperate may conceivably provide the respondent with a "more favorable result."[14]  Id.  The SAA states that the Department "will consider . . . the extent to which a party may benefit."  Id.  In requiring Commerce to undertake this consideration, the SAA apparently presupposes that the respondent could have somehow

---

[14]    Although the SAA foresees a respondent's achieving a "more favorable result" from its non-cooperation as a basis for the use of an adverse inference, the Department is not necessarily limited to using adverse inferences only when respondent's dumping margins would be reduced by respondent's actions.  The Department may employ adverse inferences, notwithstanding the impact upon a respondent's margins, provided that Commerce explains how the respondent might receive some benefit as a result of its non-cooperation.  For example, a party may be choosing the benefit of avoidance of expenses of cooperation.  Commerce does not allege facts supporting such a scenario here.

benefitted from its non-cooperation, for the Department is not to

consider *whether* the respondent benefitted, but rather, the

*extent* of that benefit.[15]

The SAA has been adopted by statute as "an authoritative

expression by the United States concerning the interpretation and

application of the [URAA] in any judicial proceeding in which a

question arises concerning such interpretation or application."[16]

 19 U.S.C. § 3512(d).  Commerce may not circumvent the binding

quasi-legislative requirements of the SAA by acting pursuant to

the agency's regulatory prohibition against placing certain

documents in the administrative record.[17]  Therefore, to the

extent that 19 C.F.R. § 351.104(a) limits the Department's

ability to examine the impact of respondent's submission in cases

---

[15]     Cf. Mannesmann I, 77 F. Supp. 2d at 1323-24
(respondent's errors found to be *de minimis* because "errors in
the figures [respondent] provided would have given it almost no
advantage compared to the 'correct' figures calculated by
Commerce," thereby warranting remand).

[16]     Cf. Antonin Scalia, Judicial Deference to
Administrative Interpretations of Law, 1989 Duke L.J. 511, 515-16
(1989) (courts do not defer to agency interpretations of a
statute where Congress includes a provision in the statute
stating that courts should give no deference on issues of
interpretation or application of statute).

[17]     See Alaskan Arctic Gas Pipeline Co. v. United States,
831 F.2d 1043, 1050 (Fed. Cir. 1987) ("This court will not defer
to an agency's interpretation of a statute or an agency's
application of regulations promulgated pursuant to a statute if
the agency action either 'contravenes clearly discernible
legislative intent' or is otherwise unreasonable.") (citation
omitted).

involving possible reliance on adverse inferences, that

regulation is not in accordance with law.[18]

The record indicates that NSC likely would have gained a

meaningless benefit by its failure to submit the weight

conversion factor.[19]  The potential expected benefit is so low

that no reasonable fact-finder would find it to be the motivation

for NSC's action.  Even if the Department had considered this

factor, in conjunction with the agency's marginally informative

observation that NSC possessed the requested data within its

control, Commerce would have lacked substantial evidence to

support its conclusion that NSC's error was more than an

excusable inadvertence and that reliance on adverse facts

available was therefore appropriate.[20]  While it is true that

---

[18]     In any event, because the Department is mandated by law
to consider the impact of respondent's non-cooperation, the court
may require Commerce to place the requisite documentation on the
administrative record.  See Acciai Speciali Terni, S.p.A. v.
United States, 120 F. Supp. 2d 1101, 1104 (Ct. Int'l Trade 2000)
(discussing F. Lli De Cecco Di Filippo Fara San Martino S.p.A. v.
United States, 21 CIT 1124, 980 F. Supp. 485 (1997)).

[19]     In terms of its dumping margin, NSC's benefit (as
calculated by NSC and uncontested by Commerce and defendant-
intervenors) amounted to [                                    ].  NSC
Obj. at 11 n.2.

[20]     Commerce also identifies NSC's submission of the weight
conversion factor data within only ten days of the preliminary
determination as additional support for the agency's use of
adverse facts available.  See Remand Determ. at 3; Def.'s Reply
Br. at 7.  The court fails to see, and the Department does not
explain, exactly how the dispatch with which a respondent
provides information that it failed to provide earlier evinces a
                                                    (continued...)

"Commerce must necessarily draw some inferences from a pattern of behavior," Borden II, 1998 WL 895890, at *1, the agency is nevertheless "not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence *fairly* demands."  Pohang Iron & Steel Co. v. United States, No. 98-04-00906, 1999 WL 970743, at *11 (Ct. Int'l Trade 1999) (quoting Allentown Mack Sales & Serv. v. NLRB, 522 U.S. 359, 378 (1998) (emphasis added)).

**CONCLUSION**

---

[20](...continued)
respondent's failure to cooperate by not acting to the best of its ability.   In fact, respondents should be encouraged to produce such information as soon as possible, for example, as in this case, before verification, so that the Department may more likely be able to incorporate the reliable data and thereby "determin[e] current margins as accurately as possible." D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997) (quoting Rhone Poulenc, Inc., v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). See also Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1192-93 (Fed. Cir. 1993) ("One of the fundamental purposes of the rules is to induce the timely submission of information to assist the ITA in determining accurate dumping margins."). Undoubtedly, had NSC been unable to procure the necessary information for a much longer period of time, for example, until after verification, the Department would have referred to respondent's significant delay or unverifiable submission as further evidence to support the use of adverse facts available. See, e.g., Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, 65 Fed. Reg. 12,202, 12,204-05 (Dep't Comm. 2000) (prelim. admin. rev.). Commerce may not apply its facts available methodology so as to place respondents who attempt to correct inadvertent errors in such a "catch-22" situation. Silver Reed America, Inc. v. United States, 12 CIT 910, 915, 699 F. Supp. 291, 295 (1988).

Commerce's recently-issued policy statement conforms to the requirements of the court's injunction regarding the placement on record of memoranda detailing *ex parte* communications between parties and Department officials.  Commerce's determination that NSC "failed to cooperate by not acting to the best of its ability," however, is unsupported by substantial evidence. Because those factors relied upon by Commerce, from which a reasonable inference could be drawn, do not constitute substantial evidence for a conclusion that NSC's actions were more than an inadvertent error, the court does not remand this case for further examination of the adverse inference issue. Rather, the court remands this case with instructions to the Department to re-calculate NSC's dumping margin without utilizing adverse facts available, in accordance with this opinion.

_____<br>
Jane A. Restani<br>
JUDGE

Dated:  New York, New York
       This 20th day of April, 2001.