**Slip Op. 01-122**

# UNITED STATES COURT OF INTERNATIONAL TRADE

NIPPON STEEL CORPORATION,

      Plaintiff,

      v.

THE UNITED STATES,

      Defendant,

      and

BETHLEHEM STEEL CORPORATION, U.S. STEEL
GROUP, A UNIT OF USX CORPORATION, ISPAT
INLAND INC., LTV STEEL COMPANY, INC.,
GALLATIN STEEL, IPSCO STEEL, INC., STEEL
DYNAMICS, INC., and WEIRTON STEEL
CORPORATION,

      Defendant-Intervenors.

Consolidated Court
No. 99-08-00466

**Public Version**

BETHLEHEM STEEL CORPORATION, U.S. STEEL
GROUP, A UNIT OF USX CORPORATION, ISPAT
INLAND INC., and LTV STEEL COMPANY, INC.,

      Plaintiffs,

      v.

THE UNITED STATES,

      Defendant,

      and

NIPPON STEEL CORPORATION,

      Defendant-Intervenor.

[ITA Second Remand Determination Remanded.]

Dated:  October 12, 2001

Gibson, Dunn & Crutcher LLP (Daniel J. Plaine, Gracia M. Berg, Merritt R. Blakeslee, and Seth M. M. Stodder) for plaintiff Nippon Steel Corporation.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer and John J. Mangan) for plaintiffs Bethlehem Steel Corporation, U.S. Steel Group, a unit of USX Corporation, Ispat Inland, Inc. and LTV Steel Company, Inc.

Robert D. McCallum, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kyle Chadwick), John D. McInerney, Elizabeth C. Seastrum, and Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

## OPINION

**RESTANI, Judge:**  Nippon Steel Corporation ("Nippon") challenges the second remand determination by the United States Department of Commerce ("Department" or "Commerce") in Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't Comm. 1999) (final determ.) ["Final Results"].  Nippon contests what it characterizes as a change in the Department's methodology upon remand as well as the Department's selection of neutral facts available in arriving at a revised dumping margin.[1]  Commerce and Defendant-intervenors, Bethlehem Steel Corporation, U.S. Steel Group, a unit of USX Corporation, Ispat Inland, Inc., and LTV Steel Company, Inc., reject Nippon's characterization of the Department's actions upon remand as a change in methodology and insist on the reasonableness of the agency's selection of neutral facts available.  Familiarity with the opinions ordering remand is presumed.

---

[1]      Nippon's separate motion to reconsider this court's earlier remand decision denying Nippon's request to invalidate the investigation is denied.

See Nippon Steel Corp. v. United States, 146 F. Supp. 2d 835 (Ct. Int'l Trade 2001) ("Nippon II"); Nippon Steel Corp. v. United States, 118 F. Supp. 2d 1366 (Ct. Int'l Trade 2000) ("Nippon I").

## I.  Change in Methodology

Nippon alleges that the Department's remand analysis constitutes a change in its methodology from that applied in the Final Results.  Nippon claims that the Department's use of weighted averages and product-specific (otherwise described as CONNUM-specific) margins was a shift in methodology that inflated Nippon's dumping margin.  Nippon also claims that Commerce's calculation of a margin for each of Nippon's products that had exclusively theoretical weight sales (in addition to margins for those products that had both actual and theoretical weight sales) was an unexplained departure from the original methodology.[2]

Commerce has not improperly changed its methodology because there has been no methodological change that necessitates further explanation here.  In stark contrast to the cases relied upon by Nippon, see, e.g., Shikoku Chems. Corp. v. United States, 16 CIT 382, 388, 795 F. Supp. 417, 422 (1992); Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988); Calcium Hypochlorite from Japan, 55 Fed. Reg. 41,259, 41,260 (Dep't Comm. 1990) (final admin. rev.), the changes undertaken by Commerce here were necessitated by this court's directive to calculate a dumping margin for Nippon without an adverse inference. See Nippon II, 146 F. Supp. 2d at 844-45.  When a court remands a determination after finding

_____

[2]        Nippon contests the Department's separate margin calculation for each the [     ] products that only had theoretical weight sales, in addition to the separate margin calculation for each of the [     ] products with both theoretical and actual weight sales.

that Commerce has relied on adverse facts available where the evidence cannot support an adverse inference, Commerce must re-calculate a margin by replacing those steps in the original calculation that were designed to be punitive with measures that are designed to be neutral.  See Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 ("SAA")  ("[19 U.S.C. § 1677e(a)] generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes . . . .  [T]he facts available are information or inferences which are reasonable to use under the circumstances.").  In other words, Commerce follows the same steps in its calculation on remand that it would if the agency were undertaking the calculation for the first time in the original investigation or administrative review with complete information, except that the agency may employ non-adverse facts available to fill informational gaps.

Had the Department been provided properly with the necessary weight conversion factor during the investigation, it would have converted the theoretical weight sales into actual weight sales and subsequently calculated a weighted average margin for each CONNUM.  See Department of Commerce, Antidumping Manual ch. 7 at 28 (1998).[3]  In doing so, margins would

---

[3]       The Department states the following in its Antidumping Manual:

Because the normal method of comparison in an investigation is weighted-average EP or CEP to weighted average NV, the boundaries of the averaging groups are extremely important.  We do not simply calculate one weighted-average price for all products within the scope of the investigation to determine EP, CEP, or NV.  While easy to do a comparison of such averages, it would be meaningless.  The items within the averaging groups should share as many common characteristics as feasible.  For example, we nearly always calculate model-specific weighted-average prices . . . .  Calculation of these "narrower" weighted-average prices yields more accurate results than broad averages which mix sales with different characteristics which affect prices . . . .

be calculated separately for each "mixed" CONNUM, i.e., those product groups with actual and theoretical weight sales, as well as for each "pure" CONNUM, i.e., those product groups with only theoretical weight sales. The fact that one set of CONNUMs contained only theoretical weight sales would not preclude that set of CONNUMs from being given a margin with the available data. Because there was no weight conversion factor on record, however, Commerce focused on "mixed" CONNUMs, with both theoretical and actual weight sales, in the Final Results. Taking the highest sale-specific margin for each of these CONNUMs, based on the actual weight sales, the Department then took a simple average of these margins, which result became the margin applied to all of Nippon's theoretical weight sales. See Final Results, 64 Fed. Reg. at 24,362; see also Second Remand Analysis Memo (June 18, 2001), at 1, R.C.R. Doc. 3, DOC Response Br., Tab 5, at 1. Nippon's overall dumping margin as a result of this calculation was 19.65%. See Final Results, 64 Fed. Reg. at 24,370.

In responding to the court's concerns expressed in the previous decisions in this case, Commerce sought on the second remand to derive a new, non-adverse dumping margin for Nippon by performing the following steps: (1) for each "mixed" CONNUM, which had both actual and theoretical weight sales, the Department calculated a weighted-average margin based on the actual weight sales (for which sufficient data existed on the record); (2) this real margin for the actual weight sales in each of these mixed CONNUMs became the facts available margin for the theoretical weight sales in the same CONNUM; and (3) for the remaining "pure" CONNUMs, which had exclusively theoretical weight sales, the Department calculated a weighted average margin of all the actual weight margins calculated in step (1) for the mixed

---

Antidumping Manual, at ch. 7, 28.

CONNUMs. See Second Remand Analysis Memo, at 1, DOC Response Br., Tab 5, at 1. These steps resulted in a revised overall dumping margin for Nippon of 18.39%. See id.

The aspects of the calculation that have changed since the final determination and about which Nippon now complains are precisely those elements that together rendered the final determination an application of adverse facts available. By using simple averages and indiscriminately applying a single margin for all theoretical sales regardless of specific CONNUM, Commerce sacrificed a certain amount of accuracy in the Final Results in order to "ensure that [Nippon] does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA, at 870. It may be possible that purposeful reliance on simple averages instead of weighted averages and the selection of a generally applicable margin that is not CONNUM-specific is appropriate to further the purposes of the adverse facts available provision of the statute. Cf. Comitex Knitters, Ltd. v. United States, 16 CIT 817, 821-22, 803 F. Supp. 410, 414-16 (1992) (upholding Commerce's reliance on simple averages in BIA methodology over respondent's objections to use more accurate weighted averages). Actions and calculations that are appropriate in the context of an adverse inference, however, may not necessarily be appropriate when calculating a margin using neutral facts available. Nippon seeks to have this court mandate, in a neutral facts available context, a methodology that the court may not even be able to permit in such a context. See Allied Tube & Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1096 (Ct. Int'l Trade 2001) (rejecting Commerce's unreasoned reliance on simple average in lieu of more accurate weighted average in non-adverse facts available context). Commerce, by ensuring that margins were based on weighted averages and were CONNUM-specific, performed its calculations here according to the standards of reasonableness which must

guide the agency in the application of neutral facts available. The court rejects Nippon's attempt to bind the Department to methodologies which would only be acceptable if no longer existing adverse inferences existed.

## II. Selection of Non-Adverse Facts Available

Nippon further argues that the Department erred in its selection of non-adverse facts to be relied upon in lieu of the missing weight conversion factor data. As an initial matter, Nippon argues that the Department is permitted to use only those "facts" that replace the specific information that is missing from the record in order for the Department to perform its margin calculations. The specific information that Nippon failed to provide in a timely manner is the weight conversion factor that is necessary to translate the theoretical weight sales made by Nippon into an actual weight basis. Commerce did not insert a substitute weight conversion factor into its calculations. Instead, the Department created substitute margins based on other evidence in the record. Nippon insists that Commerce, in failing to identify other evidence that might produce a stand-in weight conversion factor, exceeded its authority under the facts available provision of the statute.

Nippon's reading of the statute and the SAA is unduly restrictive in the limitations it places upon the agency's discretion to employ non-adverse facts available. Neither the statute nor the SAA mandate that the facts selected by the agency directly "take the place of the missing or otherwise unacceptable fact." Nippon Br., at 15. The SAA instructs the Department not simply to replace the missing facts, but to make "determinations on the basis of the facts available." SAA, at 869. The SAA further grants the Department a degree of flexibility to

CONSOL. COURT NO. 99-08-00466

"weigh[] the record evidence to determine that which is most probative of the issue under consideration," and it identifies "facts available" as "information or inferences which are reasonable to use under the circumstances." Id. Commerce may thus employ record evidence to arrive at a margin calculation in the absence of complete data, even if the evidence does not necessarily replace the precise data missing, subject to the constraint that the facts and the manner in which they are employed are reasonable. See Koenig & Bauer-Albert AG v. United States, 15 F. Supp. 2d 834, 846 (Ct. Int'l Trade 1998), aff'd in part, vacated in part on other grounds, 259 F.3d 1341 (Fed. Cir. 2001).

It does not follow from the statutory discretion to use substitute margins instead of a replacement weight conversion factor, however, that the use of the specific margins in this case was proper. As Nippon points out, the margins derived by the Department in its remand calculations could only have resulted from data that yields a weight conversion factor that seems unreasonable on its face. Because the weight conversion factor is intended to reflect the ratio of the actual weights upon delivery to the theoretical weights at which products are sold, one may not realistically expect a direct one-to-one ratio, but one would expect that the actual weights are not dramatically greater than the theoretical weights. Particularly as steel customers often pay for these products on the basis of theoretical weight rather than actual weight, a firm will seek to prevent a weight conversion factor of much greater than 1.0. For the margins to be what the Department's calculation has suggested, however, Nippon must have delivered in actual weight multiple times what it sold in theoretical weight.[4] The non-adverse facts relied upon by the

_____

[4] It appears that the implicit weight conversion factor behind the Department's remand margins is [    ], suggesting that Nippon delivered to each U.S. customer approximately [    ]%, or [    ] times, as much steel as the customer had actually bought. Nippon Br., at 16 n.6.

Department under such circumstances, therefore, cannot be said to bear "a rational relationship

between data chosen and the matter to which they are to apply." Koenig & Bauer, 15 F. Supp. 2d

at 846 (quoting Manifattura Emmempi v. United States, 16 CIT 619, 624, 799 F. Supp. 110, 115

(1992)).[5]

Finally, Nippon suggests that the Department use weight conversion data provided by

another respondent in this review, Kawasaki Steel Corporation, notwithstanding the

Department's stated concerns of improperly revealing business proprietary information by doing

---

[5]      In briefing before this court, neither Commerce nor Defendant-intervenors even attempts to respond to Nippon's arguments or otherwise rationalize the use of data that upon deconstruction reveals this grossly inflated conversion factor. Although Nippon had raised this precise concern at the agency level, the Department stated at oral argument that it had undertaken no further analysis to determine whether Nippon's [      ]% figure was accurate. Instead, the agency argues that its facially neutral methodology, discussed supra at Part I, is sufficient to render its remand determination a proper application of non-adverse facts available, notwithstanding the possibility that the facially neutral methodology rests on an implicit weight conversion factor of [      ]. The Department is incorrect. When applying non-adverse facts available, if the Department chooses to adopt a methodology to complete its margin calculation, instead of directly replacing the missing information, such methodology must be reasonable. See Mitsubishi Heavy Indus. v. United States, 54 F. Supp. 2d 1183, 1186-87 (Ct. Intr'l Trade 1999) (upholding neutral facts available methodology because "reasonable"). Where the purportedly neutral methodology results in a figure that could have been produced under ordinary circumstances (i.e., where the Department simply replaces the missing information) only by substituting incredible data for the respondent's missing information, the application of the methodology is unreasonable, and therefore, impermissible. Cf. D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997) ("Information that has conclusively been determined to be inaccurate does not qualify as the 'best information' under any test, and certainly cannot be said to serve the 'basic purpose' of promoting accuracy."); Borlem S.A. -- Empreedimentos Industriais v. United States, 913 F.2d 933, 937 (Fed. Cir. 1990) ("Congress' desire for speedy determinations on dumping matters should not be interpreted as authorizing proceedings that are based on inaccurate data."). In advance of oral argument, the court specifically asked the parties to address how this methodology might be reasonable despite the [
]% figure. No acceptable explanation was proffered. The court deems it futile to ask for Defendant again to attempt to justify its methodology.

so.[6]  Nippon's reliance on various determinations in which Commerce employed data from certain respondents to calculate a margin for another respondent is misplaced.  Those determinations either involved weight averaged data from multiple respondents that does not risk the derivation of proprietary information, Fresh Atlantic Salmon from Chile, 66 Fed. Reg. 18,431, 18,436-37 (Dep't Comm. 2001) (prelim. admin. rev.), or did not clearly use proprietary information, Certain Fresh Cut Flowers from Colombia, 52 Fed. Reg. 6842, 6845 (Dep't Comm. 1987) (final determ.).  Cf. Shop Towels from Bangladesh, 61 Fed. Reg. 55,957, 55,964 (Dep't Comm. 1996) (final admin. rev.) ("[W]e are using proprietary data from four respondents, which adequately protects each respondent's proprietary data.").  As Nippon conceded at oral argument, if the Department were to rely on Kawasaki's weight conversion data, Nippon would be able to derive that proprietary information in the same manner that Nippon was able to calculate the implicit weight conversion factor discussed supra.  Commerce, therefore, properly refused to rely on Kawasaki's proprietary weight conversion data where such use may reveal proprietary information to Nippon.  See Geum Poong Corp. v. United States, No. 00-06-00298, slip op. 01-115, at 6-7 (Ct. Int'l Trade Sept. 6, 2001).[7]

---

[6]     Nippon also urges the Department to use the company's actual weight conversion factor data, untimely submitted and therefore rejected by Commerce pursuant to 19 C.F.R. § 351.104 (2001).  At oral argument, Commerce claimed it did not use Nippon's data because the agency believed, erroneously, that the regulation rendered the submitted data unavailable for consideration.  Although the Department understandably seeks to enforce its time limits for submissions, as the court noted in Nippon II, 146 F. Supp. 2d at 840 n.6, "Commerce remains free to use NSC's data or other non-adverse data."  Although the rejected data was not verified, verification is only a spot check, and Nippon's other data did not fail verification.  Depending on necessity, it is Commerce's decision whether to use this data.

[7]     This does not mean that Commerce may not use Kawasaki's data as one check on the reasonableness of its methodology, or use it in some other generalized manner.

**Conclusion**

The Department is not prohibited from altering the original adverse inference methodology in order to ensure the use of neutral facts available when re-calculating Nippon's dumping margin. Nevertheless, the Department unreasonably selected weighted average margins for theoretical weight sales as non-adverse facts available, where those margins reflected a weight conversion factor that is clearly implausible. On remand, the agency shall devise a new approach to the determination of neutral facts available. Remand results are due within thirty (30) days hereof. Objections may be filed eleven (11) days later.

_____

Jane A. Restani

JUDGE

Dated: New York, New York

This 12th day of October, 2001